Amos S. Basel, J.
On June 9, 1968 at about 1:00 a.m. at the center operated by the Narcotics Addiction Control Commission, hereinafter referred to as NACC, at 232 East 12th Street, defendants Johnson, Robinson, Harvin were arrested. They were voluntary residents of that community, as certified addicts, civilly committed under section 206 of the Mental Hygiene Law. They were apprehended allegedly in the moment of an attempted escape.
On July 12, 1968 the defendants Hogue, Bryant and Malloy also certified as addicts under a voluntary civil commitment, did in fact escape from the same rehabilitation center.
All six cases are submitted together, for they raise common questions of law upon similar facts. A joint motion to dismiss as a matter of law on grounds defendants should not have been arrested, for no criminal proceedings lie, is here considered. All are accused of escape or attempted escape. (There are some additional minor charges lodged against four defendants.)
The prosecution is based upon section 205.10 of the Penal Law which reads as follows:
‘ ‘ A person is guilty of escape in the second degree when:
“ 1. He escapes from a detention facility; or
*539 “ 2. Having been arrested for, charged with or convicted of a felony, he escapes from custody.”
Escape in the second degree is a class E felony.
Section 205.00 defines the term “ detention facility” in subdivision 1: “ Any place used for the confinement, pursuant to an order of a court, of a person * * * (d) otherwise confined pursuant to an order of a court.” The practice commentary specifically refers to the NACO as a detention facility described and covered in paragraph (d) of subdivision 1 above.
Conviction of a class E felony carries a maximum penalty of four years’ incarceration.
Defendants Johnson and Robinson at the time of their certification had criminal proceedings pending against them. Subdivision 1 of section 206 of the Mental Hygiene Law under which they were certified provides 1 ‘ no person who has pending against him a criminal action, shall be certified to the commission pursuant to this subdivision”. But no court proceeding by way of habeas corpus or otherwise had been brought by them to terminate the order as invalid when they were' arrested.
We encounter these questions: (1) can a prosecution under section 205.10 of the Penal Law be successful when defendant is being held under a current but invalid order of commitment and escapes from detention; (2) can one who is voluntarily incarcerated under a valid order of civil commitment be charged with a class E felony if he escapes from ‘ ‘ treatment in a controlled environment ” (Mental Hygiene Law, § 200, subd. 3) a mental health facility.
The questions are discussed in reverse order.
The law which created the NACO is an exciting venture in banishing addicts from the prison system, which has proven for them an abundant failure in reinstating them in society as useful participants. This law treats drug users as psychologically disturbed persons, not to be punished, but to be restored to mental health, if possible. The Legislature has recognized that clanging prison gates do not toll the knell for addiction. The habit hibernates during incarceration and survives it. Drug addicts evermore propel themselves through a revolving door of addiction, crime and prison. Most of them hold society for ransom when they are at large; in order to provide themselves with funds to finance their compulsion they must violate “ law and order ”. Half the crimes committed on the sidewalks and byways of New York are connected with drug use.
The narcotic act attempted to arrive at deliverance for both addicts and society by replacing prison with hospitalization. *540 Hope and healing are to supplant vengeance, the addict’s cure is to become society’s gain.
The Narcotics Control Act, as it should, treats addicts committed voluntarily differently from those certified as convicted narcotic addicts. As originally written, the statute also made a distinction between the convicted addict who escapes (§ 211, subd. 2) (original statute) and the voluntary certified addict who escapes. The former was guilty of a misdemeanor, the latter was to be declared delinquent, a warrant issued for his arrest and he would be rehospitalized (§ 211, subds. 3 and 4). This section failed to provide for any criminal punishment as a penalty.
It soon appeared that addicts of both types determined that bars, even by any other name, do a prison make and escapes from the narcotic control centers abounded. News stories of inmates breaking out were plentiful. The gossip spread through the drug world that the program was intended merely to confine addicts and was a confidence game played upon them and in reality constituted three years of incarceration under an alias. (People ex rel. Blunt v. Narcotic Addiction Control Comm. 58 Misc 2d 57, 62.) “As previously stated, over 50% of the addicts presently in custody by their own choice do not take part in its rehabilitative plan ”. (There is substantial authority to the contrary; p. 60.)
Drug users convicted of crimes denied they were cured and demanded hearings on the question of their addiction. They sought and preferred prison under the Penal Law rather than rehabilitation under the narcotics act. They feared the law had become “ a mere device for warehousing the obnoxious and antisocial elements of society ” (Sas v. State of Maryland, 334 F. 2d 506, 516). The courts have been swamped Avith these hearings (New York Times, Feb. 1, 1968, p. 33). Voluntary commitments which were abundant at first became rare and are at present, for lack of budget, not accepted by the commission despite the law.
To contain the bad publicity, evidently, by “deterring” escapes, the commission appears to have recommended and received repeal of subdivision 2 of section 211 of the original Narcotics Control Act. It now attempts to keep the hospital doors locked by relying upon section 205.00 of the Penal Law, claiming all addicts committed to a detention facility under court order who escape are guilty of a felony. All addicts conAÚcted as well as those civilly committed are to be treated alike. Prosecution for a felony is the method to be used to contain the sick who ask for help. The crack of the whip is *541 heard again in the faith it will solve the escape problem. We appear to have forgotten the admonition in the report of the President’s Commission on Justice. In the Task Force Report on Corrections at pages 50 to 51 it is said: “ There are strong indications in modern psychology and practical experience, however that reward regulates behavior more effectively than punishment. This means that staff will procure conformity to desired behavior standards more effectively by making conformity gratifying to inmates than it will by imposing penalties for non-conformity, even though some imposition of penalties is unavoidable * * *. Furthermore, the imposition of penalties tends to evoke hostility in the inmate towards the punishing officer * # , * when penalties seem excessive * * * or otherwise unjust it is difficult for the officer to be accepted also as a friend or counselor.”
This emphasis upon prosecution appears a reversal of the legislative intent expressed in article 9 of the Mental Hygiene Law. There it was said: ‘ ‘ The purpose of this article is to provide a comprehensive program of human renewal of narcotic addicts in rehabilitation centers and aftercare programs.” (Mental Hygiene Law, § 200, subd. 3.)
In the instant cases the commission itself is seeking a favorable ruling; its employees are the complainants and have refused to withdraw the complaints.
By performing the role of accuser and avenger in the desire to deter escape from its facilities, the commission violates the intent of the statute.
We must recognize addicts to be stricken, diseased people. They use drugs to quiet their enormous anxieties and in the belief they will thus solve their extreme emotional and psychic problems. Addiction is therefore fundamentally an escape from reality. (The methadone program claims a physical dependence as well.) Cure requires as a first, uneasy step, facing the world and grappling with it. In the course of any treatment, there must be relapses. ' Often the cure becomes intolerable and the patient seeks surcease from viewing the truth about himself, runs away from it all and turns his back on cure. He acts out his need to flee from life by running from hospitalization, the current reality with which he cannot cope. (See Nyswander, “ The Drug Addict as Patient.”) He is unable to confront the mirror of himself and smashes the glass. It is then the addict most needs understanding and guidance. He cries out for help. By this prosecution the commission seeks to treat the terrible, anguished moment, when healing is urgent and sympathy and warmth required, by reverting to the lash and the rack.
*542 We are asked to hold in the instant cases that boys who voluntarily seek help and recovery and are not charged with crime (civil commitment) upon relapse into escape be converted into criminals, removed from the healing process and condemned to jail. '1 There is no question that relapse, an ever present possibility, is one of the factors making the treatment of addiction so difficult.” (Nyswander, supra, p. 54.) (We do not pass on the problem of convicted addicts’ punishment; that is not before us.)
The constitutional rights of the civilly committed addict who is brought before the court on the petition of another, are carefully preserved in article 9 of the Mental Hygiene Law. He may proceed against commitment by habeas corpus. He has a right to examine the charge, he may have a hearing. He has a right to counsel, to cross-examination, to witnesses in his own behalf. He is entitled to a jury trial. He cannot be assigned to a correctional institution whether committed upon Ms own petition or that of a third party.
The reliance upon punishment for escape under section 205.00 of the Penal Law unhinges the constitutional footings of article 9 of the Mental Hygiene Law. We substitute punishment for cure. We allow the Narcotic Commission to become alchemists who turn patients civilly accepted by the courts into felons. The forbidden correctional institution becomes the addict’s assignment.
We know addicts long for escape (Nyswander, supra). Drugs fulfill this need. When one has arrived at reality, faces his problem, begins to resolve it, and then retreats, if his relapse is punished as criminal, we condemn him for his status as an addict. This is cruel and inhuman punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution. (Robinson v. California, 370 U. S. 660.) In
determining this result we judge the crime alleged and the method imposed to punish it. To punish these defendants’ escape by applying section 205.10 of the Penal Law is to impose vengeance upon sickness, we transform the hospital room into a prison cell, and this must therefore of necessity be cruel and inhuman punishment. As Mr. Justice Douglas said in Robinson v. California (supra, p. 676): “ A punishment out of all proportion to the offense may bring it within the ban against ‘ cruel and unusual punishments.’ ”
To quote Justice Douglas further at page 678, he concludes : “We would forget the teachings of the Eighth Amendment if we allow sickness to be made a crime and permitted sick people *543 to be punished for being sick. This age of enlightenment cannot tolerate such barbarous action.” (Italics supplied.)
I am mindful of the case of People ex rel. Farruggio v. Nenna (57 Misc 2d 229), which is the only other case construing this statute. It is distinguished in that it was a habeas corpus proceeding. Also the court there held only (p. 231): “ When a person is civilly committed to the care and custody of the Narcotic Addiction Control Commission, his confinement becomes compulsory and he must continue to have treatments for the statutory time designated by law. ’ ’ With this holding we have no quarrel.
The motions are granted. I dismiss as a matter of law against the defendants legally and properly committed.
This result makes it unnecessary to explore the second question posed here. The defendants Johnson and Robinson who were improperly committed have a legal right to terminate their incarceration in a proper proceeding. This, they have not accomplished. As long as they are confined under the order they are subject to it. Illegal detention is no justification or defense to a prosecution for escape. (People v. Briggs, 19 NY 2d 37; People ex rel. Haines v. Hunt, 229 App. Div. 419; 60 W. Va. L. Rev. 369; People ex rel. Scrum v. Hunt, 230 App. Div. 801.)
But since these defendants intended to become voluntarily committed addicts, my dismissal of the escape counts in the other cases covers them and I dismiss these charges against them also, as a matter of law.
The criminal mischief charges remain and must be faced by the defendants so accused.
The burglar tool counts are dismissed. These defendants admittedly were not in the process of committing a burglary and cannot be so cited. The hacksaw in their possession admittedly was to be used for escape, not to commit a larceny or forcible entry.