*650 OPINION OF THE COURT
Edward J. McLaughlin, J.
The court is confronted with a case of first impression. Can a person alleged to be a person in need of supervision (PINS) escape from a detention facility when, under recent changes in the law, a PINS may not be confined in a secure detention facility? This court holds that under present law and regulations a status offender cannot be found to have escaped from detention.
FACTS
This case comes before the court on a motion to dismiss a petition alleging that the respondent herein committed an act, which if it had been committed by someone who had reached their 16th birthday would be the crime of escape in the second degree. (Penal Law, § 205.10, subd 1.) It is alleged that on October 15, 1979, respondent left the Wells Boarding Home, a detention facility, without authorization. Respondent was in the Wells Boarding Home on October 15, 1979, as the result of a long saga which began with the filing with this court on June 27, 1979, of a petition alleging that respondent remained overnight with friends, refused to return home and had engaged in such behavior since June 14, 1979, and was a person in need of supervision.
"At the outset the court takes judicial notice of its own records that relate to the proceeding before it.” (Matter of Denlow, 87 Misc 2d 410, 411.) There have been numerous appearances in this case (see Matter of Freeman, Family Ct, Onondaga County, Docket No. D-396-79, Oct. 24, 1979, Nov. 20, 1979, transcript of hearing), and a recitation of the details those appearances will not serve to elucidate the issue now before the court — the motion to dismiss the escape charge. The number of appearances does, however, demonstrate a characteristic behavior pattern of the respondent. She is a "runner.”
LAW
ESCAPE
"At common law, the criminal offense of escape was defined broadly as 'any departure from lawful custody.’ However, many jurisdictions have now enacted escape statutes which expressly proscribe only escapes from certain law enforcement *651 or correctional employees or institutions, or which merely prohibit escapes from places of 'detention’ or 'confinement.’ ” (Ann. 69 ALR3d 625, 629.) In New York a person is guilty of escape when "[h]e escapes from a detention facility”. (Penal Law, § 205.10, subd 1.) A detention facility as it relates to the case now before the court "means any place used for the confinement, pursuant to an order of a court, of a person * * * charged with being or adjudicated a * * * person in need of supervision”. (Penal Law, § 205.00, subd 1; this definition became effective on May 2, 1972.)
No reported New York cases have dealt with the escape from detention of a status offender. Trial courts have, however, considered whether or not persons who have been civilly committed and who voluntarily reside in a drug rehabilitation center may be charged with escape. In the case of People v Malloy (58 Misc 2d 538) the Criminal Court of the City of New York, New York County, held that three persons who escaped from a State-run narcotics rehabilitation center did not commit a criminal offense within the meaning of the Penal Law. Subsequently, two other trial courts held that such an escape did fall within the ambit of the Penal Law definition of escape. (People v Bifulco, 64 Misc 2d 10; People ex rel. Farruggio v Nenna, 57 Misc 2d 229.) Here, however, the court is not concerned with drug abusers but with a status offender, a person less than 16 years of age who is a truant or who is "incorrigible, ungovernable or habitually disobedient and beyond the lawful control of a parent”. (Family Ct Act, § 712, subd [b]; Matter of Patricia A., 31 NY2d 83.)
The only case which the court has found which is closely analogous to the case at bar is a decision by the Supreme Court of New Jersey, State in Interest of M. S. (73 NJ 238). Under New Jersey law a juvenile charged with conduct which classifies him as in need of supervision cannot be placed in detention but may only be placed in shelter care. (NJ Stat Ann 2A:4-56, subd c.) Escape under New Jersey law is committed when a person "detained in a place of confinement” or in "the lawful custody or control” of a variety of persons "by force or fraud escapes or attempts to escape from such place” or person. (NJ Stat Ann 2A:104-6.) The New Jersey court concluded that the escape statute did not apply to a juvenile in need of supervision (JINS) who had been placed in shelter care. The reasoning of the New Jersey court is apposite: "A JINS placed in a shelter care facility obviously is in the *652 custody of the person in charge of the shelter and is not free to come and go at will. * * * Yet, the juvenile’s conduct is not in the category of a criminal escape. The unauthorized leaving of a shelter is symptomatic of the very problem for which shelter care is being provided. * * * The crime of escape is an affront to the authority of the State. It is criminal because it offends against social order and the rule of law. A child who runs from a shelter, though, harms only his or her well being. Such conduct cannot be considered the equivalent of the crime of escape.” (State in Interest of M. S., 73 NJ, p 244-245.) Similarly, the New Jersey Superior Court found that the New Jersey escape statute did not render criminally culpable an unauthorized departure from a psychiatric institution by a person involuntarily committed to the institution. (State v Kyles, 166 NJ Super 343.)
While not a case dealing with an alleged violation of an escape statute, a California court has addressed the problem of the detention of PINS in nonsecure facilities. (Matter of Ronald S., 69 Cal App 3d 866.) This court is indebted to Judge Robert Gardner for his explicit and often eloquent exposition on the dilemma in which the Juvenile Court Judge is placed by the current laws regarding the detention of status offenders. In commenting upon the presumptions underlying the current laws, which state that status offenders may not be detained in secure facilities, Judge Gardner notes: "The trouble with this philosophy is that [status offenders] are often somewhat irresponsible, not to say nomadic. As a matter of fact, the overwhelming number of [status offenders] are runaways. An immediate result of [the California Legislature prohibiting secure detention] was that while the authorities were doing the preliminary paperwork at the front door of an unsecure home for a runaway, the runaway was simply running away again out the back door. Placing a runaway in a nonsecure environment is something of a exercise in futility. To put it quite as succinctly as possible, [status offenders] began to scatter like a covey of quail. As a result, the juvenile court judges of this state lost control of the situation and as an inevitable result, parents, police and the public became increasingly irate.” (Matter of Ronald S., 69 Cal App 3d, pp 872-873.) Further, Judge Gardner observed (p 873) that this legislative scheme for "the fleet footed” status offender on occasion "makes juvenile court judges look ridiculous.”
The California legislation was passed because previously *653 "bootstrapping” had been a problem in California. Under former California law, a status offender could become a juvenile delinquent by failing to obey a lawful order of the court. Thus, the court pointed out, by simply walking out of a foster home, a status offender could become a juvenile delinquent. "Bootstrapping” is a phenomenon that the California Legislature was determined to stop, even though runaways continue to run. The New York Legislature has also made it impossible for a status offender to be "bootstrapped” into a juvenile delinquent.
THE DETENTION OF P.I.N.S. IN NEW YORK
The New York Legislature has responded to the mandates of the Federal Government and has enacted legislation which prohibits the placement of "a child alleged or adjudicated as a person in need of supervision” (PINS) in a secure detention facility after the director of the State Division for Youth has certified that a county has "conveniently accessible and adequate non-secure detention facilities”. (Family Ct Act, § 720, subd 3.) On April 3, 1979, a letter was sent to the County Executive of Onondaga County stating that Onondaga County was so certified and that no PINS was to be placed in secure detention after September 1, 1979, under any circumstances. Thus, on October 15, 1979, respondent, an alleged PINS, could not be placed in secure detention in Onondaga County.
The Legislature in enacting section 720 of the Family Court Act was attempting to adapt New York law so that New York State could be eligible to receive certain Federal funds.[1] In 1974, Congress passed the Juvenile Justice and Delinquency Prevention Act. (88 US Stat 1109.) Section 223 (subd [a], par [12], cl [A]) of the Juvenile Justice and Delinquency Act of 1974 (US Code, tit 42, § 5633, subd [a], par [12], cl [A]) (Pub L 95-115, § 4), requires States, in order to receive formula grants to: "[P]rovide within three years after submission of the initial plan that juveniles who are charged with or who have committed offenses that would not be criminal if committed by an *654 adult, or such nonoffenders as dependent or neglected children, shall not be placed in juvenile detention or correctional facilities”. "Failure to achieve compliance with the [provision for nonsecure detention of PINS] shall [in most cases] terminate any State’s eligibility for funding”. (US Code, tit 42, § 5633, subd [c].)
Definition of a juvenile detention or correctional facility has been difficult. The Office of Juvenile Justice and Delinquency Prevention (OJJDP), Law Enforcement Assistance Administration (LEAA) has defined a juvenile detention or correctional facility as "any secure public or private facility used for the lawful custody of accused or adjudicated juvenile offenders or nonoffenders.” (State Planning Agency Grants Guideline Manual, M 4100, 1 F, change 3, July 25, 1978, ch 3, par 52, (n), (2) and appendix 1, par 4; 44 Fed Reg 55784, Sept. 27, 1979.) Further refinements of this definition may be found in comments by the OJJDP staff reported in the Federal Register of September 27, 1979 (44 Fed Reg 55785): "Where the operation involves exit from the facility only upon approval of staff, use of locked outer doors, manned checkout points, etc., the facility is considered secure. If exit points are open but residents are authoritatively prohibited from leaving at any time without approval, it would be a secure facility.” It was further stated in the September 27, 1979, Federal Register that "OJJDP considers its current definition, which includes elements of both physical security and psychological restraint, to provide the necessary elements to guide states in the classification of facilities.” (44 Fed Reg 55785.)[2]
The Assistant County Attorney argues that New York is not bound by the Federal definition of secure detention. This argument is without merit in that the New York definitions of secure and nonsecure detention were formulated in an attempt to adhere to Federal guidelines. While the operational definitions of secure and nonsecure detention are found in the State regulations amplifying the Executive Law (Executive Law, § 510-a; 9 NYCRR Part 180) the sort of detention in which a PINS child may be placed is controlled by subdivision 3 of section 720 of the Family Court Act. This is the section which was enacted to protect New York State’s eligibility to *655 receive Federal funding. (See n 1, at p 6, supra.) It states that an alleged or adjudicated PINS such as respondent, may not be held in a secure detention facility in a county that has been certified as having adequate nonsecure facilities.
It should be noted that in the present case the court finds itself in a situation somewhat analogous to the California court in that respondent allegedly walked through an unlocked door after being asked to remain at the Wells Boarding Home by Ms. Wells. The dilemma of walk-through runaways is not, however, the issue before the court. The issue is whether such behavior constitutes a criminal offense.
"It is a fundamental rule of statutory interpretation that of two constructions which might be placed upon an ambiguous statute one which would cause objectional consequences is to be avoided.” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 141.) Were the court to find that an agency boarding home was a detention facility within the meaning of the escape provision of the Penal Law (Penal Law, § 205.00, subd 1; § 205.10, subd 1), the court with such a construction would be opening the way for the erosion of the State’s Federal funding through the LEAA. This loss could run into millions of dollars each year in direct and indirect Federal aid. Further, the court is loath to "bootstrap” a PINS allegation into a juvenile delinquent charge by the commission by the PINS of an act which is characteristic behavior of PINS and, as the New Jersey Supreme Court noted, more harmful to the child than to the social order and the rules of law. (State in Interest of M. S., 73 NJ 238, 244-245, supra.)
Accordingly, since the Legislature has attempted to amend the law of New York so that the Federal guidelines regarding juvenile detention are met, this court holds that an alleged PINS who is held in a nonsecure agency boarding home (9 NYCRR 180.3 [b] [2]) is not in "detention” for purposes of the criminal escape provisions of the Penal Law.
The court can but follow the laws as they are enacted by the Legislature. It would be of great assistance to this court, however, and to other courts before which status offenders appear, if the Legislature was to reconsider the manner in which runaways are to be treated. The revolving relationship between the runaways and the court must be rectified.
The California court put forth three possible solutions to the current dilemma in the case of Matter of Ronald S. (69 Cal App 3d 866, supra). They are that:
*656 (1) The Legislature could decide that status offenders are not the business of the State and leave the parent and child to work out their problem without State help or interest (Matter of Ronald S., 69 Cal App 3d, p 872).
(2) The Legislature could allow the State to intervene but remove the status offender "from the courts and place it in some other governmental agency which does not have the coercive power of a court. Thus the State could provide facilities to which runaways would come voluntarily — where shelter, food, medical care, advice and counsel could be maintained” (Matter of Ronald S., 69 Cal App 3d, p 874; see IJA/ ABA Juvenile Justice Standards, Noncriminal Misbehavior).
(3) The Legislature could decide to retain the court’s jurisdiction over status offenders and allow the runaway to be maintained in a secure setting. (Matter of Ronald S., 69 Cal App 3d, p 875.) In New York, of course, this alternative could jeopardize the State’s LEAA funding.
A fourth alternative is for the Legislature to provide a procedure by which a child could petition the court for emancipation. (See Juvenile Law — Emancipation: New Legislation for Oregon’s Children, 57 Ore L Rev 573.) What, if any, change is made in the current law is, of course, beyond the competence of this court to decide.
The motion to dismiss the petition is granted.

. The legislative history of subdivision 3 of section 720 of the Family Court Act indicates that the Division for Youth had made studies which indicated that secure detention facilities were being utilized for the confinement of PINS while nonsecure facilities were under utilized. The division reported that such use of detention was not only inappropriate but resulted in unnecessary expense. "Furthermore, such usage of secure detention facilities could jeopardize state eligibility for federal funds since it conflicts with federal laws and regulations.” (1978 McKinney’s Session Law of NY, p 1736.)

. "The contents of the Federal Register shall be judicially noticed.” (US Code, tit 44, § 1507; see Sims v Southern Bell Tel. & Tel. Co., 111 Ga App 363; cf., Cresap v Pacific Inland Nav. Co., 78 Wn 2d 563; this court duly notes the commentary on detention that appeared at 44 Fed Reg 55784-55785.)