OPINION OF THE COURT
Irving Lang, J.
An unusual issue is raised by defendant’s motion to dismiss the indictment: can a person acquitted by reason of insanity, who is placed pursuant to court order in a nonsecure mental health facility, be indicted for the crime of escape?
I. FACTS
On November 22, 1978, the Grand Jury of New York County indicted the defendant Gilbert Ortega for the crimes of rape in the first degree and related offenses. On January 8, 1981, following a jury trial before Honorable Morris Goldman, the defendant was found not responsible by reason of mental disease or defect. In March 1981, following a hearing pursuant to CPL 330.20 (6), Justice Goldman found that the defendant was suffering from a dangerous mental disorder and committed the defendant to the Commissioner of Mental Hygiene. He was placed in a “secure” facility.
On September 3, 1981 and on October 27, 1982, Honorable Angelo Ingrassia and Honorable David Ritter, both of the Orange County Court, signed first and second retention orders, *718 respectively, thereby continuing the defendant in the custody of the Commissioner of Mental Hygiene.
On November 14, 1983, Ronald T. Greene, Acting Director of the Bureau of Forensic Services, applied for a transfer order on the ground that Ortega was no longer suffering from a dangerous mental disorder and no longer warranted continued confinement in a secure facility. Following a hearing at Orange County Court on February 22,1984, Honorable Peter Patsalos signed an order transferring the defendant from Mid-Hudson Psychiatric Center to Bronx Psychiatric Center. The latter is a nonsecure mental health facility. The transfer was effected on March 8, 1984.
The People allege that on April 2,1984, at approximately 1:00 p.m., the defendant left Bronx Psychiatric Center without authorization. Four days later, the defendant voluntarily surrendered to Port Authority Police and was returned to the psychiatric facility. On May 4, 1984, the Grand Jury of Bronx County indicted defendant Ortega for the crimes of escape in the second degree and escape in the third degree (Penal Law § 205.10 [1]; § 205.05). A warrant for defendant’s arrest was executed at Bronx Psychiatric Center, and on May 7, 1984 the defendant was arraigned before this court. He interposed a plea of not guilty. The present motion ensued.
II. ISSUE
Defendant’s motion to dismiss the indictment presents the issue whether an unauthorized departure from a nonsecure psychiatric facility, by an insanity acquittee confined therein pursuant to CPL article 330, constitutes the crime of escape. Stated otherwise, what type of conduct did the Legislature intend to criminalize when it enacted the escape statute? In order to ascertain the legislative intent, a two-pronged analysis is required. Both the plain language of the escape statute and the over-all statutory scheme relating to insanity acquittees must be examined.
III. THE STATUTES AND THE CONTENTIONS
The first count of the indictment charges the defendant with escape in the second degree. Penal Law § 205.10 (1) defines this offense as follows:
“A person is guilty of escape in the second degree when:
“1. [h]e escapes from a detention facility”.
Detention facility is defined as “any place used for the confinement, pursuant to an order of a court, of a person (a) charged *719 with or convicted of an offense, or (b) charged with being or adjudicated a youthful offender, person in need of supervision or juvenile delinquent, or (c) held for extradition as a material witness, or (d) otherwise confined pursuant to an order of a court.” (Penal Law § 205.00 [1].) Paragraph (d) of this section is at issue here.
The second count of the indictment charges the defendant with the class A misdemeanor of escape in the third degree. This offense is defined in Penal Law § 205.05: “A person is guilty of escape in the third degree when he escapes from custody.” The term custody “means restraint by a public servant pursuant to an authorized arrest or an order of a court.” (Penal Law § 205.00 [2].)
The defendant contends that the Legislature never intended to include insanity acquittees, involuntarily committed to mental hospitals pursuant to court order, within the ambit of the escape statute. With regard to the misdemeanor count, the defendant argues that the term “custody” applies only to one who stands in a penal relationship before the court, and not to an insanity acquittee who is confined to a hospital for treatment.
With reference to the felony count, the defendant asserts that Bronx Psychiatric Center is not a “detention facility” and that the term “any place used for the confinement * * * of a person * * * otherwise confined pursuant to an order of a court” (Penal Law § 205.00 [1] [d]) is not intended to apply to a psychiatric treatment center.
The defendant also argues that CPL article 330 is the exclusive avenue of adjudication for insanity acquittees, and that CPL 330.20 provides the sole remedy for one who escapes from confinement from an institution such as Bronx Psychiatric Center.
In opposition to defendant’s motion to dismiss, the People argue that defendant Ortega’s unauthorized departure does constitute the crime of escape. Regarding the misdemeanor count, the prosecutor argues that People v Buthy (85 AD2d 890 [4th Dept 1981], lv denied 55 NY2d 1040 [1982]) is controlling. In Buthy, the defendant, an insanity acquittee who eloped from Gowanda Psychiatric Center, a secure facility, was indicted for escape in the second degree. He pleaded guilty to escape in the third degree and then appealed, arguing that Gowanda Psychiatric Center was not a detention facility, and therefore the evidence before the Grand Jury was insufficient to establish the felony. The Appellate Division affirmed the conviction, and noted in dicta that: “It appears clearly that the evidence estab *720 lishes defendant’s commission of escape, third degree, a lesser included offense of escape [in the] second degree, in that defendant escaped from the custody of the Commissioner of Mental Hygiene, a public servant under whose restraint he was placed by court order” (p 890; emphasis added). The prosecutor argues that this statement in Buthy is dispositive of Ortega’s challenge regarding the legal sufficiency of the misdemeanor count.
With reference to the felony count, the People contend that the wording of Penal Law § 205.10 (1) is clear and unambiguous, and that defendant’s action in leaving Bronx Psychiatric Center falls squarely within the plain language of that statute.
The prosecutor further asserts that CPL 330.20 was not intended by the Legislature to be the exclusive remedy for dealing with the unauthorized departure of an insanity acquittee from a psychiatric facility. He argues that the procedures contained in CPL 330.20 are purely permissive, and do not divest the Penal Law escape provisions of their substantive applicability in this case.
While the defendant’s commitment as a mentally ill person is central to this case, neither his competency to stand trial (CPL art 730) nor his criminal responsibility are involved in this motion. He was found fit to proceed at his trial in 1981. And the acquittal by reason of insanity was a determination that he was not responsible by reason of mental disease or defect at the time of the alleged rape in 1978. Neither law nor logic presumes continued lack of responsibility. The finding that the defendant was suffering from a “dangerous mental disorder” after his trial means that he was mentally ill within the meaning of Mental Hygiene Law § 1.03, which makes no reference to either competency to stand trial or criminal responsibility (CPL 330.20 [1] [c]; [2]).
IV. ANALYSIS
(A) Survey of Existing Case Law
No New York case has specifically addressed the question of whether criminal liability should attach to an insanity acquittee who “escapes” from a nonsecure psychiatric facility. A few New York cases (such as People v Buthy, supra) have tangentially touched upon the issue.
In People ex rel. Powell v Warden (73 AD2d 654 [2d Dept 1979]), petitioner was found unfit to proceed to trial pursuant to CPL article 730 and was admitted to Mid-Hudson Psychiatric Hospital. Two years later, a hearing was held at which time it was determined that there was no substantial likelihood that *721 petitioner would be competent to stand trial in the foreseeable future. In accord with the mandate of Jackson v Indiana (406 US 715), petitioner was admitted by the hospital director as an involuntary patient under Mental Hygiene Law § 9.27. He was subsequently transferred to Kingsboro Psychiatric Center, a less restrictive institution. Less than 60 days later, petitioner left the Kingsboro Psychiatric Center without permission. He voluntarily returned the same day and was charged with escape in the first degree. In granting the petition for a writ of habeas corpus, the Appellate Division held that petitioner’s escape was not criminal. The court reasoned that although the defendant had been confined at the time of his escape, he was not confined pursuant to an order of the court. Since he escaped during the initial 60-day period, he was confined pursuant to the discretionary action of the hospital director. The indictment was thus held to be defective.
In the context of a drug treatment center, two New York courts have held that where a person is voluntarily civilly committed to the Narcotic Addiction Control Commission (hereinafter NACC) pursuant to court order, and he escapes from a drug rehabilitation facility, he can be indicted for escape in the second degree. (People v Bifulco, 64 Misc 2d 10 [1969]; People ex rel. Farruggio v Nenna, 57 Misc 2d 229 [1968].) These cases held that drug treatment centers were detention facilities within the meaning of the escape statute. (But see, contra, People v Malloy, 58 Misc 2d 538 [Crim Ct, NY County 1968].)
Finally, in Matter of Freeman (103 Misc 2d 649 [Fam Ct, Onondaga County 1980]) the Family Court held that a person alleged to be in need of supervision who is committed by a court to a nonsecure boarding home as a status offender is not in “detention” as that term is defined in Penal Law article 205 (see also, Matter of Sylvia H., 78 AD2d 875 [2d Dept 1980]).
Thus, existing New York case law does not provide a clear precedent for resolution of the present issue. Moreover, the decisions from sister States and Federal courts reflect a marked diversity of opinion. For example, in United States v Powell (503 F2d 195 [DC Cir 1974]) the U.S. Court of Appeals held that the defendant’s escape from a mental hospital to which he was committed following an acquittal by reason of insanity did not violate the Federal Escape Act (18 USC § 751 [a]).[1] The court *722 reasoned that the Federal escape statute could be violated only if the defendant was in custody “by virtue of an arrest on a charge of felony, or conviction of any offense”. Since a defendant’s acquittal by reason of insanity was not a conviction, and since the arrest lost its legal vitality upon the acquittal, defendant’s “escape” did not violate 18 USC § 751 (a). The court held that upon defendant’s acquittal by reason of insanity he was in custody pursuant to a separate statute — DC Code Ann § 24-301 (d). [2] That statute embodies a separate escape provision which expressly supersedes the Federal Escape Act (DC Code Ann § 24-301 [h]).[3] That separate escape provision states: “When a person has been ordered confined in a hospital for the mentally ill pursuant to this section and has escaped from such hospital the court which ordered confinement shall, upon request of the government, order the return of the escaped person to such hospital.” (DC Code Ann § 24-301 [i]; emphasis added.) The Powell holding was adhered to in United States v Wood (628 F2d 554 [en banc, DC Cir 1980]). “18 U.S.C. § 751 (a) does not apply to a patient who escapes from St. Elizabeths Hospital, having been confined there upon his acquittal in a prior criminal case by reason of insanity” (supra, at p 560).
Similar reasoning is expressed in State v Delafose (185 Ct 517, 441 A2d 158 [1981]). In Delafose the Supreme Court of Connecticut held that defendant’s escape from a State mental institution, where he had been committed pursuant to a verdict of not guilty by reason of insanity did not constitute the felony of escape in the first degree (Conn Gen Stat Ann § 53a-169).[4] The court held that the escape statute only applied to an individual who is “ ‘in the custody of the commissioner of correction or is required to be returned to the custody of said commissioner upon his release’ ” (supra, at p 525). Since the insanity acquittee was sent directly *723 to a mental hospital and into the jurisdiction of the Commissioner of Mental Health, the court reasoned that he could not be prosecuted for felony escape.
In State v Kyles (166 NJ Super 343, 399 A2d 1027 [Super Ct, App Div 1979]) the New Jersey court also held that the escape statute (NJ Stat Ann § 2A:104-6)[5] does not apply to the unauthorized departure from a psychiatric institution by a person who is involuntarily civilly committed. Rejecting the State’s contention that a civil commitment order constitutes a “writ or process in a civil [proceeding]” the court reasoned that “the legislature did not intend criminal culpability to attach to the wanderings of involuntarily committed persons suffering from mental illness” (supra, at p 1029). The court also rejected the argument that civil commitment is “detention for law enforcement purposes” (supra, at p 1030).[6]
In contrast, the California Legislature has specifically designated the escape of one committed to a mental health facility upon a finding of insanity a crime. (Cal Penal Code § 1026.4.)[7] Similarly, in State v Flemming (377 A2d 448 [Me 1977]), the Supreme Judicial Court of Maine held that an escape by an individual confined in a mental health institution upon a finding of not guilty by reason of mental disease or defect does fall within the purview of the escape statute.[8] The phrase “other place of confinement” was deemed to include a mental health facility where an individual is held subject to judicially ordered *724 restraint on his movement. (See also, People v Giles,_Col_, 662 P2d 1073 [1983], where the Supreme Court of Colorado held that the due process and equal protection clauses are not violated by application of the escape statute to those committed to a State facility as a result of a prior insanity adjudication; State v Ewing, 518 SW2d 643 [Mo 1975], which held that an insanity acquittee who escapes from a mental health facility may be prosecuted for a felony.)
It is thus apparent that there exists a distinct polarization of views on the issue of the criminal liability of the insanity acquittee who escapes from a mental hospital. In order to determine whether Gilbert Ortega’s unauthorized departure from Bronx Psychiatric Center constitutes conduct proscribed by the New York escape provisions, the point of departure must be the interpretation of the relevant statutes.
(B) Rules of Statutory Construction
Certain fundamental tenets of statutory interpretation are applicable here. First, words of ordinary import are to be given their usual and commonly understood meaning unless it is plain from the statute that a different meaning is intended (Matter of Bolden v Blum, 68 AD2d 600, 602 [3d Dept], affd 48 NY2d 946 [1979]). When the statutory language is precise and definite, courts should not go elsewhere in search of conjecture so as to restrict or extend that meaning. (Matter of Erie County Agric. Socy. v Cluchey, 40 NY2d 194, 200 [1976].) Courts may only look behind the words of a statute when the law itself is doubtful or ambiguous. (Finger Lakes Racing Assn. v New York State Racing & Wagering Bd., 45 NY2d 471, 480 [1978].) Finally, “ ‘of two constructions which might be placed upon an ambiguous statute one which would cause [objectionable] consequences is to be avoided.’” (Matter of Freeman, 103 Misc 2d, at p 655.)
(C) The Felony Count — A Literal Interpretation
Given the above rules of statutory construction, the initial question is whether the defendant’s action falls within the plain meaning of the statute and whether the definition of “detention facility” was intended to include Bronx Psychiatric Center.
The defendant was confined at Bronx Psychiatric Center by virtue of three orders: (1) a retention order signed by Judge Ritter; (2) a transfer order signed by Judge Patsalos; and (3) an order of conditions, which provided that the defendant shall not leave the facility without permission. The District Attorney alleges that since Bronx Psychiatric Center is a place used for confinement of a person pursuant to court order, it is a detention *725 facility. Since defendant Ortega is a person confined pursuant to court order, and since his departure from the detention facility was unauthorized, an escape was committed within the plain meaning of the felony statute and the inquiry must stop.
The prosecutor’s argument has logical appeal. On its face, the felony escape statute appears to encompass defendant’s act. However, were one to extend the District Attorney’s theory to its logical limit, the result would be that any person who is civilly committed to any facility by order of the court (be it a mental hospital, a halfway house, or a hostel for the mentally disabled) who leaves that facility without permission, could be found guilty of felony escape. Thus, if the prosecutor’s argument is correct a purely literal interpretation of the statute would mean that if a mentally ill parent was certified or committed to a hospital by a court at the behest of the children and the parent left the facility without authorization he would be guilty of a felony escape. (See, Mental Hygiene Law former art 5 for involuntary commitment procedure by a court.) The same reasoning would apply to a parent petitioning the court for commitment of a mentally defective child under Mental Hygiene Law, former art 6, § 124 (1). That section authorizes a court to order a mentally defective person to “be certified to and confined in any licensed private institution” (emphasis supplied). If the mental defective escapes from that private institution in violation of the court order, can we assume that the Legislature intended that he be prosecuted for escape?
It is clear that these issues cannot be resolved by merely examining the escape statute. We must also examine the nature of the facility and the nature of the individual so confined.
(D) Detention Facility Secure v Nonsecure Facility
The term “detention facility” was first incorporated into the Penal Law in 1965. Between 1909 and 1965, the law of escape was contained in Penal Law of 1909 §§ 1609 and 1694. Those provisions contained a definition of the term “prison” and “prisoner”. Penal Law of 1909 § 1690 defined a “prison” as “any place designated by law for the keeping of persons held in custody under process of law, or under lawful arrest.” “[Prisoner” was defined as “any person held in custody under process of law, or under lawful arrest.” The substantive offense, contained in Penal Law of 1909 § 1694 was defined as follows:
“Prisoner escaping
“A prisoner who, being confined in a prison, or being in lawful custody of an officer or other person [by force or fraud] escapes *726 from such prison or custody, is guilty of a felony if such custody or confinement is on a charge, arrest, commitment or conviction for a felony; and of a misdemeanor if such custody or confinement is upon a charge, arrest, commitment or conviction for a misdemeanor.”
No significant changes in the law occurred until 1942, when the Legislature made it a misdemeanor to escape following a conviction for an offense, traffic infraction, or violation of an ordinance. (Penal Law of 1909 § 1694; L 1942, ch 142.) At this time, no reference was made to psychiatric or civil commitments.
In 1943, the Legislature again expanded section 1694 and declared it a misdemeanor to escape from custody following arrest or commitment in a civil action or proceeding. In the revision notes to L 1943, ch 134, the drafters stated that the 1943 amendment was “intended to make it a misdemeanor to escape from lawful custody on civil arrests or to aid such escape or to rescue a civil prisoned’ (Note of Commission, McKinney’s Cons Laws of NY, Book 39, Penal Law of 1909 § 1694, p 283; emphasis added). Again, the term prisoner (as opposed to patient) is utilized, and no reference whatsoever is made to a psychiatric commitment or to a psychiatric facility.
No further significant amendments to the statute were undertaken until the adoption, in 1965, of the revised Penal Law. The 1964 Commission Staff Notes of the Temporary State Commission of Revision of the Penal Law and Criminal Code (at 373) provide an interesting perspective regarding the Legislature’s aim vis-a-vis the term “detention facility”: “Section 210.00 [subsequently enacted as § 205.00] defines four terms that are used throughout * * * Article 210 [renum article 205] The definition of [the term] ‘detention facility’ in subdivision 1 substantially restates existing Penal Law § 1690” (emphasis added). Thus, not only were the drafters of the present provision reiterating existing law, but there is absolutely no indication, as the District Attorney suggests, that one of the purposes of the expansion of the section was to include escape from a mental health facility.
Finally, the current Practice Commentaries to Penal Law § 205.00 (1) (Hechtman, McKinney’s Cons Laws of NY, Book 39, p 434) reflect the same theme. It states: “[t]he * * * term, ‘detention facility,’ is designed to replace the term ‘prison’ which was defined in former Penal Law § 1690 as ‘any place designated by law for keeping of persons held in custody under process of law, or under lawful arrest.’ Since the term ‘prison’ is popularly thought of as a specific place of confinement for persons already convicted, subdivision one of § 205.00 is intended simply to *727 clarify the situation by defining a term of broader applicability. Clause (d) of subdivision one is intended to apply to such places as a civil jail used for the confinement of persons committed thereto in connection with a civil action or proceeding” (emphasis added). Thus, as the prosecutor points out, although the term detention facility has a broader meaning than the term “prison”, the limits on the term’s applicability are clearly indicated. That is paragraph (d) (“otherwise confined pursuant to court order”) is narrowly construed to apply to facilities such as civil jail, not a psychiatric hospital.
It is also significant that the Legislature has directly addressed the problem of escapes by youthful offenders, PINS, juvenile delinquents, material witnesses, etc., by explicitly referring to those groups when defining the term “detention facility”. In contrast, it has never referred to insanity acquittees in the same context. Indeed, the Legislature had the perfect opportunity to do so, in 1980, when it revised the Criminal Procedure Law and enacted the Insanity Defense Reform Act. Since there is a conspicuous absence of any reference to mental health facilities or insanity acquittees in Penal Law § 205.00 (1) it is reasonable to conclude that paragraph (d) of the statute was not intended to encompass departures by such persons from those facilities.
If, by some strained interpretation, the Legislature meant to include psychiatric hospitals within the parameters of the term “detention facility”, the question arises as to what type of psychiatric facility was contemplated. In the 1960’s when the term “detention facility” was defined, insanity acquittees were mostly sent to Mattawan State Hospital or Dannemora from which nobody escaped (thus the paucity of case law). Today there is a wide range of options available for rehabilitation of the mentally disabled (including insanity acquittees), such as halfway houses, community residences and hostels for the mentally ill (14 NYCRR parts 111, 586). In these facilities, there is supervised interaction with the community, and the monitoring of patient’s activities is less strict. It is doubtful that the Legislature contemplated such treatment centers, back in 1965, when it framed the definition of detention facility. In this regard, it is significant that Bronx Psychiatric Center is a nonsecure mental hygiene facility, and that Ortega’s transfer to that facility was predicated on finding that he was no longer suffering from a dangerous mental disorder. (14 NYCRR 541.7 [c].)[9]
*728 This court is unaware of any statutory or regulatory definition of “nonsecure facility”. However, a secure facility is defined as follows: “Secure facility means a psychiatric center or unit of a psychiatric center operated by the Office of Mental Health staffed with personnel adequately trained in security methods and so equipped as to minimize the risk or danger of escapes. The following facilities are secure facilities: Mid-Hudson Psychiatric Center; Hutchings Regional Forensic Unit; Gowanda Regional Forensic Unit; and Manhattan Forensic Unit.” (14 NYCRR 541.1 [z]; emphasis added.)
It is obvious that in a secure facility a premium is placed on security, confinement and prevention of escapes. In contrast, in a nonsecure facility, since the defendant no longer suffers from a dangerous mental disorder and since his transfer must, according to the regulations, be consistent with public safety, a premium is placed not on security and confinement, but on therapy and rehabilitation. It would be anomalous to apply penal sanctions to a departure from a facility which has, as its primary goal, therapeutic treatment as opposed to confinement.
The distinction between secure and nonsecure facilities has previously been recognized by courts construing the felony escape statute. For example, in Matter of Freeman (103 Misc 2d 649, supra), the court was confronted with the issue whether a person alleged to be in need of supervision (PINS) could “escape” from a detention facility when, pursuant to recent changes in the law, she could not be confined in a secure detention facility. The court held that since the alleged PINS was held in a nonsecure agency boarding home, she was not in detention for the purposes of the criminal escape provisions of the Penal Law (supra, at p 655).
The Freeman court (supra), adopting the reasoning of the New Jersey court in State in Interest of M.S. (73 NJ 238, 374 A2d 445), noted that “[t]he crime of escape is an affront to the authority of the State. [I]t offends against social order and the rule of law. A child who runs from a [nonsecure] shelter * * * harms only his or her well being. Such conduct cannot be considered the equivalent of the crime of escape” (supra, at p 652.) (See also, Matter of Sylvia H., 78 AD2d 875, supra, which held that a person in need of supervision who runs away from a Title II nonsecure facility in which she has been placed cannot, solely by virtue of that act be adjudicated a juvenile delinquent in that she committed an act which if done by an adult, would constitute the crime of escape in the second degree.)
*729 In direct contrast to the PINS situation are those cases referred to above, dealing with escapes from drug treatment facilities. In the latter instance, the security of the facility was considered a priority and, consequently, an escape from such facility was deemed a felony. As stated by Justice Titone, if the Penal Law did not apply to escapes from drug rehabilitation facilities: “it could seriously undermine the narcotic rehabilitation program * * * Addicts would continually attempt to escape * * * If they are caught they lose relatively little, and if they are not, their illegal end is accomplished. A facility would spend more time concerning itself with these constant attempts than in curing its patients.” (People v Bifulco, 64 Misc 2d 10, 12, supra.)
Given that Bronx Psychiatric Center is a nonsecure mental health facility, where the primary emphasis is on care, treatment and rehabilitation of the mentally disabled, I hold that it does not constitute a detention facility within the meaning of Penal Law § 205.00 (1) and § 205.10 (1), and that an unauthorized departure therefrom does not constitute felony escape.
(E) CPL article 330 and Valenza
Additional support for this holding is found in the 1980 Insanity Defense Reform Act (embodied in CPL art 330), and in the recent Court of Appeals decision in People v Valenza (60 NY2d 363).
CPL article 330 contains comprehensive postverdict procedures for the treatment of insanity acquittees. In CPL 330.20, a “three track” procedure scheme is established. (People v Flock-hart, 96 AD2d 843 [2d Dept 1983].) The rules applicable to any particular insanity acquittee are determined by the court, based upon a finding of that person’s condition at an initial hearing. (CPL 330.20 [6].) If the District Attorney establishes that the defendant is suffering from a dangerous mental disorder (CPL 330.20 [1] [c]), the court issues a commitment order, committing the defendant to a secure facility under the jurisdiction of the Commissioner of Mental Health (CPL 330.20 [1] [f]; [6]). Once this occurs, the District Attorney is entitled to notice of all proceedings relating to the defendant’s retention, transfer, conditional release, or discharge from such facility. The District Attorney may request a hearing to challenge any change in the defendant’s facility or status (CPL 330.20 [8], [9], [10], [11], [12], [13]), and may veto any such change if he can establish that the defendant is still suffering from a dangerous mental disorder.
If a defendant is adjudged to be mentally ill but not suffering from a dangerous mental disorder, he falls within a second *730 category, and is subject to the provisions of CPL 330.20 (7). Subdivision (7) requires the court to issue an order of conditions and commit the defendant to the custody of the Commissioner of Mental Health. The latter order is deemed an involuntary civil commitment made pursuant to Mental Hygiene Law article 9. Significantly, the Mental Hygiene Law does not accord the District Attorney veto power with respect to a patient’s release from a mental hospital, nor does it authorize the District Attorney to participate as a party in retention or release proceedings. (People v Flockhart, supra, at p 845.)
Finally, if a defendant is found not to have a dangerous mental disorder and not to be mentally ill, the court must discharge the defendant either unconditionally, or subject to an order of conditions (CPL 330.20 [7]).
Relevant to the present issue is CPL 330.20 (19) which states: “Escape from custody; notice requirements. If a defendant is in the custody of the commissioner pursuant to an order issued under this section, and such defendant escapes from custody, immediate notice of such escape shall be given by the department facility staff to: (a) the district attorney, (b) the superintendent of state police, (c) the sheriff of the county where the escape occurred * * * and (f) any law enforcement agency and any person the facility staff believes would be able to apprise such endangered person that the defendant has escaped from the facility * * * The defendant may be apprehended, restrained, transported to, and returned to the facility from which he escaped by any peace officer” (emphasis added). Similarly, 14 NYCRR 541.12 sets forth the measures to be taken in the event that a defendant, who was found not responsible by reason of mental disease or defect, leaves the grounds of a facility without prior authorization.[10]
*731 Two important factors become apparent upon examination of the above provisions: (1) the Legislature has developed an elaborate statutory scheme for the retaking of insanity acquittees; and (2) under these provisions, there is no mention of any criminal penalty directed toward the escapee for his unauthorized departure. Rather, the Legislature merely directs the return of the escapee to the psychiatric facility and does not require the escapee’s arrest and detention in a prison on a criminal charge. These factors, analyzed in light of People v Valenza (supra), prevent the District Attorney from prosecuting Gilbert Ortega for felony escape.
In Valenza (supra), the Court of Appeals held that when a vendor collects taxes from customers, but fails to remit them to the State under circumstances evincing an intent to permanently deprive the State of the taxes, he may not be subject to criminal prosecution for larceny by embezzlement. The court reasoned that the structure of the penalty provisions of the Tax Law, coupled with the Legislature’s failure to consider the wrongful withholding of sales taxes as criminal conduct, evinces an intent by the Legislature to make the civil penalty the exclusive means of punishing that conduct. The Valenza court emphasized that when two or more statutes proscribe the same conduct, a prosecutor may generally choose among the statutes when initiating prosecution. However, “that discretion may be limited by a legislative intention to make a specific statute the exclusive means of punishing particular conducf’ (60 NY2d, at p 371; emphasis added). The court further stated that “when the Legislature has desired to make the breach of a statutorily imposed duty punishable under the Penal Law, it has done so in an unambiguous manner” (supra, at pp 370-371).
The Valenza (supra) rationale is applicable here. As evidenced by CPL 330.20, the Legislature has enacted a complex integrated amalgam governing the treatment of insanity acquittees.
*732 It has not seen fit to specifically ascribe criminal sanctions when such individual elopes from a psychiatric treatment facility. Had the Legislature intended the unauthorized departure to be criminal, it could have effectuated such an intention in unambiguous terms by simply incorporating the sanctions of Penal Law article 205 within CPL article 330.
Indeed, in the past, when the Legislature meant to penalize the escapes of persons undergoing treatment in a rehabilitation facility, its pronouncement was unmistakenly clear. By way of illustration, reference may be made to New York’s former drug law and cases interpreting those statutes illustrating this principle. Under the former drug law, a defendant who was a narcotics addict could be certified to the care and custody of the Narcotics Addiction Control Commission (Mental Hygiene Law former §§ 206, 208, 211). Under Mental Hygiene Law § 211 (2), in effect prior to 1968, the Legislature specifically provided that any defendant who “while confined to a rehabilitation center, escapes therefrom, is guilty of a misdemeanor.” Upon revision of that section, the Legislature demonstrated its intention to continue to classify escapes by narcotics addicts as criminal by retaining the designation of NACC facilities as detention facilities, within the meaning of Penal Law article 205 (see, 14 NYCRR former 1000.5). In People v Bifulco (64 Misc 2d 10, supra), the court acknowledged that former Mental Hygiene Law was not intended to supplant the Penal Law, due to the explicit interrelationship between the Mental Hygiene Law, the Penal Law, and the NACC regulations. As noted above, the Bifulco court held that a defendant who was civilly committed under Mental Hygiene Law former § 206 to the NACC and confined in a rehabilitation center specifically designated as a detention facility, within the meaning of the Penal Law, and who escapes therefrom, may properly be indicted for felony escape (see also, People ex rel. Farruggio v Nenna, 57 Misc 2d 229, supra).
Therefore, it would be a violation of the Valenza (supra) ruling to adopt the practice of jurisdictions such as Colorado, Maine and Missouri, where criminal escape provisions are applied to departures by insanity acquittees. If the New York Legislature intended to criminalize the escape of such an individual it could have enacted (as did the California Legislature) a specific statute clarifying that purpose.
I also reject the prosecutor’s argument that People ex rel. Powell v Warden (73 AD2d 654, supra) stands for the proposition that a psychiatric facility can qualify as a “detention facility” if *733 a court order requires the defendant’s presence there. That case is inapposite for two reasons: (1) since it deals with a CPL article 730 commitment and not with the escape of an insanity acquit-tee, that court had no occasion to consider the interplay between CPL 330.20 and Penal Law article 205; and (2) when a person is committed pursuant to CPL article 730, he still has criminal charges pending against him; in contrast when a person is committed pursuant to CPL article 330 he has been acquitted of all criminal charges.
When drafting CPL 330.20 the Legislature could have authorized prosecution of an insanity acquittee who elopes from a psychiatric treatment facility. Since it did not the Valenza rationale applies, “when the Legislature has intended to make * * * conduct [criminal] it has done so clearly.” (People v Valenza, supra, at p 370.)
(F) The Misdemeanor Count
The People argue that the dicta in People v Buthy (85 AD2d 890, supra) is controlling with respect to the misdemeanor count. Specifically, the District Attorney contends that since Ortega escaped from the custody of the Commissioner of Mental Hygiene, and since the Commissioner is a public servant under whose restraint defendant was placed by order of the court, defendant may be charged with escape in the third degree. However, the Buthy case preceded Valenza and in my view was superseded by it.
The Valenza rationale discussed with regard to the felony count applies with equal force to the misdemeanor count. The fact that the Legislature makes no reference to penal sanctions in CPL 330.20 reflects an intent to insulate insanity acquittees from all criminal prosecution for escape. Had the Legislature intended to punish such escapes as misdemeanors, it could have unambiguously done so. Under Valenza it is not within the power of this court to subject a defendant to any criminal sanction unless the Legislature’s mandate in that regard is unmistakably clear.
Finally, the District Attorney argues that since the escape procedures outlined in CPL 330.20 are purely permissive by implication the Penal Law provision may be appropriately applied.
Specifically he refers to the language in CPL 330.20 (19) (f) which asserts that an insanity acquittal escapee “may be apprehended, restrained, transported to, and returned to [such institution]” (emphasis added). The use of the word “may” according *734 to the prosecutor is merely an alternative to the penal escape provision.
However, the statutory language in CPL 330.20 is exactly the same as contained in Mental Hygiene Law, former article 3, § 53, enacted in 1948 (amended in 1955) entitled “Powers and duties of peace officers to apprehend, restrain and transport persons to institutions”. This only buttresses the view that the person committed under the Criminal Procedure Law should be treated in the same manner as the person committed under the Mental Hygiene Law.
v. CONCLUSION
Gilbert Ortega cannot be prosecuted for his unauthorized departure from Bronx Psychiatric Center. The Legislature has spoken with respect to escapes by insanity acquittees in CPL article 330. Since that statutory scheme is silent with respect to penal sanctions, this court should not impose them. In addition, the felony statute does not apply in this case in any event; at no time did the Legislature indicate that the term “detention facility” should encompass a psychiatric institution which houses an insanity acquittee. Indeed, that position is even more compelling here, inasmuch as Bronx Psychiatric Center is a nonsecure facility, where the goal is therapy and treatment, as opposed to confinement.
It is perfectly clear that the insanity acquittee is a legal hybrid — quasi criminal and quasi civil. Courts and Legislatures may constitutionally apply more restraints upon such an individual than upon other mentally ill persons. Indeed, CPL 330.20 is an example of this. They must however be clear and well defined. The Legislature, as in California, could pass a statute authorizing felony prosecution of an insanity acquittee, who escapes from either a secure or nonsecure facility. Such a statute is, however, the province of the Legislature, not this court.
Defendant’s motion to dismiss the indictment is granted.

. The Federal Escape Act (18 USC § 751 [a]) provides, in relevant part: “Whoever escapes * * * from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate, or from the custody of an officer or employee of the United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of an arrest on a *722 charge of felony, or conviction of any offense, be fined not more than $5,000 or imprisoned not more than five years, or both”.

. DC Code Ann § 24-301 (d) states: “(1) If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release”.

. DC Code Ann § 24-301 (h) provides: “the provisions of this section shall supersede in the District of Columbia the provisions of any federal statutes or parts thereof inconsistent with this section.”

. Conn Gen Stat Ann § 53-a-169 (a) provides: “A person is guilty of escape in the first degree (1) if he escapes from a correctional institution or (2) * * * from any public or private, nonprofit halfway house, group home or mental health facility * * * and he is in the custody of the commissioner of correction or is required to be returned to the custody of said commissioner upon his release from such facility”.

. NJ Stat Ann § 2-A: 104-6 stated: “Any person imprisoned or detained in a place of confinement, or being in the lawful custody or control of a penal or correctional institution or of an officer or other person, upon any charge, indictment, conviction or sentence for any crime or upon any writ or process in a civil action or proceeding, or to await extradition, who by force or fraud escapes or attempts to escape from such place of confinement or from such custody or control, or leaves the building or grounds of his place of confinement without the consent of the officer in charge, is guilty of a misdemeanor.”

. NJ Stat Ann § 2C:29-5 deals with removing oneself without lawful authority from official detention. Official detention is defined as either arrest, detention in a facility for the custody of persons under charge or conviction of a crime, or who has been alleged or found to be delinquent; or detention for a law enforcement purpose. (NJ Stat Ann § 2C:29-5 [a].)

. Cal Penal Code § 1026.4 (a) states: “Every person committed to a state hospital or other public or private mental health facility pursuant to the provisions of Section 1026, who escapes from or who escapes while being conveyed to or from the state hospital or facility, is punishable by imprisonment in the county jail not to exceed one year”.

. The Maine statute (17 Me Rev Stat Ann former § 1405) provided: “Whoever being lawfully detained in any jail or other place of confinement * * * breaks or escapes therefrom or attempts to do so shall be punished * * * The sentence to such imprisonment shall not be concurrent with any other sentence then being served”.

. 14 NYCRR 541.7 (c) provides: “The application [for a transfer order] shall contain facts * * * to substantiate the view that the defendant does not have a dangerous mental disorder or that, consistent with the public safety *728 and welfare of the community and the defendant, the clinical condition of the defendant warrants transfer from a secure * * * to a nonsecure facility.”

. 14 NYCRR 541.12 states:
“Escape, (a) In the event a defendant leaves the grounds of the facility without prior authorization or fails to return on time from a furlough, the clinical director, the unit chief, the defendant’s physician, the defendant’s treatment team leader or any other member of the facility staff shall immediately notify:
“(1) the district attorney of the county from which the defendant was committed;
“(2) the Superintendent of State Police;
“(3) the sheriff of the county where the facility is located;
“(4) the court which issued the order under which the defendant is currently being held;
“(5) the police department having jurisdiction of the area where the facility is located, of the area in which the defendant last resided, of the area in which any person who might be harmed resides; and any other law enforcement agency the clinical staff deem appropriate;
*731 “(6) any person who may reasonably be expected to be assaulted or otherwise harmed by the patient;
“(7) the patient’s immediate family;
“(8) the patient’s attorney, if any; and
“(9) any person or entity the court that committed the defendant to the custody of the commissioner may have designated in the order issued under [CPL] 330.20.
“(b) The director of Forensic Services and the Mental Health Information Service shall * * * be notified immediately.
“(c) The notice shall be given as soon as the facility staff discover the defendant’s absence, and shall include the information necessary to identify the defendant and any person or person believed to be in danger and the nature of the danger”.