[888 NYS2d 513]

In the Matter of DYLAN C., Respondent. PRESENTMENT AGENCY, Appellant.

Second Department, October 13, 2009

APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Kristin M. Helmers* and *Deborah A. Brenner* of counsel), for appellant.

*Steven Banks*, New York City (*Tamara Steckler* and *Marcia Egger* of counsel), for respondent.

### OPINION OF THE COURT

ENG, J.

The juvenile justice system in New York State has undergone fundamental change over the last several decades and has developed a variety of nonsecure detention facilities intended to promote rehabilitation. These facilities stand in stark contrast to secure detention facilities administered primarily for the purposes of confinement and punishment. The issue we are called upon to decide on this appeal is whether a nonsecure facility for the placement of alleged and adjudicated juvenile delinquents is a "detention facility" within the scope of Penal Law § 205.10, which sets forth the elements of the crime of escape in the second degree. For the reasons which follow, we conclude that such nonsecure detention facilities, which did not exist when the Penal Law provisions relating to the crime of escape in the second degree were enacted, do not fall within the intended ambit of Penal Law § 205.10. Accordingly, the Family Court properly granted the motion of the respondent, Dylan C., to dismiss the petition alleging that he had committed an act which, if committed by an adult, would have constituted escape in the second degree, and properly dismissed the petition.

The relevant facts are largely undisputed. On November 1, 2007, a petition was filed in the Family Court, Queens County, charging that Dylan C., who was then 15 years old, had committed acts which, if committed by an adult, would have constituted several crimes, including robbery in the second degree.

Upon the filing of the Queens County delinquency petition, Dylan C. was paroled to his mother. However, in January 2008, Dylan C. was suspended from school for smoking marijuana, and in March 2008 he was placed on "pre-suspension" for another incident. As a result of Dylan C.'s conduct, on March 19, 2008, the Family Court issued an order pursuant to Family Court Act § 320.5 remanding him to the custody of the New York City Department of Juvenile Justice for placement in a nonsecure detention facility until the date scheduled for his fact-finding hearing. The remand order included findings that detention was necessary because there was a serious risk that Dylan C. would commit an act constituting a crime prior to the next court date, and that continued placement at home would not be in his best interest because he was beyond parental control. That order further provided that if Dylan C. violated the rules of nonsecure detention, he could be transferred to a secure facility without further court action.

Pursuant to the remand order, Dylan C. was immediately placed in a nonsecure detention facility located in Brooklyn. However, on the following evening, March 20, 2008, Dylan C. allegedly absconded from the facility by running out a side door. An alarm sounded, and a child care worker pursued Dylan C., catching up to the youth several blocks away and returning him to the facility.

About two months later, on May 16, 2008, the presentment agency (hereinafter the agency) filed a new delinquency petition against Dylan C. in the Family Court, Kings County, alleging that he had committed an act which, if committed by an adult, would have constituted the crime of escape in the second degree in violation of Penal Law § 205.10. Dylan C. subsequently moved to dismiss the Kings County petition, arguing that a nonsecure facility of the type which houses both alleged and adjudicated juvenile delinquents, and alleged and adjudicated persons in need of supervision (hereinafter PINS), was not a "detention facility" within the purview of the escape statute. In support of his position, Dylan C. relied upon the Court of Appeals' decision in *People v Ortega* (69 NY2d 763 [1987]), which held that a defendant who had been found not legally responsible for a crime due to mental illness could not be found guilty of escape for absconding from a nonsecure psychiatric facility. He also cited cases holding that PINS children could not be charged with escape for absconding from nonsecure detention (*see e.g. Matter of Sylvia H.*, 78 AD2d 875 [1980]; *People v Dupont*, 179 Misc 2d 79 [1998]; *Matter of Freeman*, 103 Misc 2d 649 [1980]).

In opposition to the motion, the agency acknowledged that nonsecure facilities are less restrictive than secure facilities, but maintained that nonsecure facilities fall within the ambit of the Penal Law because the juveniles in such facilities are nevertheless in detention. The agency further contended that *Ortega* was distinguishable because the defendant in that case was confined to a nonsecure psychiatric facility for the purpose of therapy, while Dylan C. was confined because of the risk that he would commit another act constituting a crime. The agency also urged the court to find that case law involving PINS children was inapposite because such children are placed in detention facilities for the purpose of treatment and rehabilitation rather than punishment.

In the order of dismissal appealed from, the Family Court, upon an order dated July 25, 2008, granting Dylan C.'s motion to dismiss the petition, dismissed the petition, concluding that the nonsecure facility from which he absconded was not a detention facility within the scope of the escape statute because it was not a place used for the confinement of juveniles. The court also rejected the agency's position that the purpose for which Dylan C. was placed was dispositive of the issue of whether he was confined, and noted that, in any event, all detention facilities housing juveniles are intended to be therapeutic. The agency now appeals, continuing to maintain that a nonsecure facility falls squarely within the Penal Law's definition of detention facility, and that the Court of Appeals' decision in *Ortega* is distinguishable. We affirm.

We begin our analysis by examining the relevant statutory provisions, and considering the historical context in which they were enacted. The predecessor to Family Court Act § 320.5, which authorizes the detention of an alleged juvenile delinquent pending a fact-finding hearing, was originally enacted in 1962, when the only available form of detention for young people in this state was secure detention (*see* Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 320.5, at 25). Three years later, in 1965, the Legislature enacted Penal Law § 205.10 (1), which provides that a person is guilty of escape in the second degree when he or she "escapes from a *detention facility*" (emphasis added). The corresponding definition of "[d]etention facility," which has remained essentially unchanged since 1965, is

"any place used for the confinement, pursuant to an order of a court, of a person (a) charged with or

convicted of an offense, or (b) charged with being or adjudicated a youthful offender, person in need of supervision or juvenile delinquent, or (c) held for extradition or as a material witness, or (d) otherwise confined pursuant to an order of a court" (Penal Law § 205.00 [1]).

Penal Law § 205.00 (1) was last amended in 1972 to substitute the phrase "person in need of supervision" for "wayward minor."

In the decades following the enactment of these statutory provisions, the juvenile justice system has evolved to place increased emphasis on the education and rehabilitation of troubled youths, with the goal of helping them become contributing members of society when they reach adulthood. Spearheaded by the Juvenile Justice and Delinquency Prevention Act of 1974, which encourages community-based alternatives to secure detention (*see* 42 USC § 5601 *et seq.*), nonsecure detention facilities began to proliferate across New York in the late 1970s and 1980s. With this change in focus, "[d]etention formerly administered solely for the purpose of punishment became an opportunity for the provision of services" (Roffe, *NYC Department of Juvenile Justice—'Making a Difference for 20 Years: 1979-1999,'* New York Correction History Society, http://www.correctionhistory.org/html/chronicl/djj/djj20yrs2.html [accessed July 29, 2009]).

Today, a wide variety of nonsecure detention facilities exist, including family boarding homes, agency-operated boarding homes, and group care facilities (*see* 9 NYCRR 180.3 [d]). These facilities are designed to provide structured residential care for alleged and adjudicated juvenile delinquents in a supportive, family-like environment (*see* Juvenile Detention Association of New York State, Inc., http://jdanys.org; SEEDS [Sowing Encouragement and Education to Develop Skills] Non-Secure Detention, http://www.nyc.gov/html/djj/html/nonsecure.html [accessed July 29, 2009]). By statute, such nonsecure facilities must be "characterized by the absence of physically restricting construction, hardware and procedures" (Family Ct Act § 301.2 [5]). Discussing the current state of New York's juvenile detention network, a leading commentator has observed that the term "nonsecure detention" is itself misleading because "the child is not locked up, but rather placed temporarily in an open setting" (Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 320.5, at 25). Thus, while the

child "is uprooted from his home environment, perhaps because of parental deficiencies or perhaps because the court concludes that remaining in the local community will foster the commission of an additional crime, the result is far less restrictive than secure detention" (id.). In contrast, in secure detention facilities, which are "characterized by physically restricting construction, hardware and procedures" (Family Ct Act § 301.2 [4]), the movement of residents is restricted by both door locks and requirements that residents be accompanied by staff at all times (see Roffe, Juvenile Detention in New York—Then and Now, New York Correction History Society, http://www.correctionhistory.org/html/chronicl/djj/djj20yrs3.html [accessed July 29, 2009]).

When placed in historical context, it is strikingly apparent that the Legislature contemplated only secure detention facilities, which were the norm in the 1960s, when it statutorily defined "detention facility" to include a place used for the confinement of any person charged with being or adjudicated a juvenile delinquent. Moreover, there is no indication of a legislative intent to include nonsecure detention within the scope of the escape in the second degree statute. In this regard, it is significant to note that despite the proliferation of nonsecure juvenile placement facilities over the last 30 years, the Legislature has never amended the Penal Law definition of detention facility to make specific reference to nonsecure facilities. If the Legislature had intended to include a juvenile's conduct in running away from a nonsecure facility within the scope of the escape in the second degree statute, it could have indicated its intention to do so in clear terms (cf. People v Ortega, 69 NY2d at 765). The Legislature's failure to do so supports an inference that it did not intend to criminalize absconding from nonsecure detention.

Furthermore, while the Penal Law § 205.00 (1) definition of "[d]etention facility" does not expressly distinguish between secure and nonsecure facilities, both the nature of a nonsecure facility, and the purpose for which youths are placed, may appropriately be taken into account in determining whether absconding from such a facility constitutes the crime of escape in the second degree. This point is illustrated by the rationale of People v Ortega (127 Misc 2d 717 [1985], affd 118 AD2d 523 [1986], affd 69 NY2d 763 [1987]). In Ortega, the defendant was found not responsible for the crime of rape in the first degree by reason of a mental disease or defect, and was committed, in

the custody of the Commissioner of Mental Health, to the Mid-Hudson Psychiatric Center, a secure facility. Two years later, the Acting Director of the Bureau of Forensic Services applied for a transfer order upon the ground that the defendant was no longer suffering from a dangerous mental disorder and, thus, no longer warranted continued confinement in a secure facility (*see Ortega*, 127 Misc 2d at 718). Following a hearing, the County Court, Orange County, signed a transfer order, and the defendant was transferred to the Bronx Psychiatric Center, a nonsecure facility. About a month after his transfer, the defendant left the psychiatric center without authorization. He voluntarily surrendered to the police about four days later, and was returned to the psychiatric center. The defendant was subsequently indicted on charges of escape in the second degree and escape in the third degree, whereupon he moved to dismiss the indictment (*id.*). The Supreme Court, Bronx County, granted the defendant's motion, reasoning, inter alia, that a person found not responsible due to mental disease or defect and held under a commitment order who leaves a nonsecure psychiatric facility without authorization cannot be charged with escape because such a facility is not a "detention facility" within the meaning of the felony escape statutes (*id.* at 729-733).

In support of its decision to dismiss the indictment, the Supreme Court pointed out that when the term "detention facility" was added to the Penal Law in 1965, persons held under a commitment order were primarily placed in secure facilities. However, by the 1980s, a much wider range of options existed for rehabilitation of the mentally ill, including halfway houses, community residences, and hostels, where patients were less strictly monitored (*id.* at 725-728). Taking into consideration the difference between these types of psychiatric facilities, the Supreme Court observed that

> "[i]t is obvious that in a secure facility a premium is placed on security, confinement and prevention of escapes. In contrast, in a nonsecure facility, since the defendant no longer suffers from a dangerous mental disorder and since his transfer must, according to the regulations, be consistent with public safety, a premium is placed *not* on security and confinement, but on therapy and rehabilitation. It would be anomalous to apply penal sanctions to a departure from a facility which has, as its primary goal, therapeutic treatment as opposed to confinement" (*id.* at 728).

The decision in *Ortega* was affirmed by the Appellate Division, First Department, for the reasons stated by the Supreme Court (*People v Ortega*, 118 AD2d 523 [1986]), and thereafter was affirmed by the Court of Appeals (*People v Ortega*, 69 NY2d 763 [1987]). In affirming, the Court of Appeals briefly stated that "[w]e agree with the courts below that a nonsecure facility does not constitute a detention facility within the meaning of Penal Law § 205.00 (1) and that, therefore, defendant cannot be guilty of escape in the second degree (Penal Law § 205.10)" (*id.* at 764). The Court of Appeals also noted that once the defendant was transferred to a nonsecure facility based upon the finding that he was no longer suffering from a dangerous mental disorder, the purpose of his custody changed from security, confinement, and the prevention of escape, to therapy and rehabilitation (*id.* at 764-765).

The agency argues that a critical distinction between *Ortega* and the case at bar is that the defendant's status in *Ortega* did not expressly fit within the statutory definition of "detention facility," which makes reference to individuals charged as or adjudicated to be juvenile delinquents, but does not specifically include psychiatric patients or persons held under a commitment order. The agency thus maintains that, in *Ortega,* the courts were faced with resolving a statutory ambiguity as to whether the Legislature intended to include psychiatric facilities within the scope of the detention facilities referenced in the escape statute. This alleged distinction is without merit. Although the agency correctly points out that Penal Law § 205.00 (1) contains no specific reference to psychiatric facilities for the placement of persons held under a commitment order, this statutory omission played no role in the Court of Appeals' decision in *Ortega*. Rather, the Court of Appeals' affirmance was predicated on the fact that once the defendant was found to be no longer dangerous, the purpose of his placement changed, resulting in a corresponding change in the type of facility in which he was placed. Moreover, it was settled prior to the Court of Appeals' decision in *Ortega* that escape from a psychiatric facility could indeed subject a person held under a commitment order to prosecution if the facility from which he or she escaped was a secure one, in which personnel are trained in security methods and equipped to minimize the risk or dangers of escape (*see People v Walter*, 115 AD2d 52, 54 [1986]). Indeed, the Court of Appeals cited *Walter* in its decision in *Ortega,* signaling its agreement that a distinction should be drawn between secure and nonse-

cure psychiatric facilities for the placement of persons held under a commitment order. Thus, the rationale of *Ortega* cannot be distinguished based solely upon the fact that facilities for the confinement of persons held under a commitment order are not included in the statutory definition of detention facility.

Here, as in *Ortega,* an examination of the nature of Dylan C.'s placement, as well as the type of facility in which he was placed, demonstrate that he was not remanded to a detention facility used for the confinement of alleged and adjudicated juvenile delinquents within the meaning of Penal Law § 205.00 (1) and, thus, cannot properly be charged with having committed an act which would constitute the crime of escape in the second degree. Turning first to the nature of the placement, we reject the agency's contention that the paramount purpose of remanding Dylan C. to nonsecure detention was public safety. Although the Family Court Act was amended in 1976 to require the need for community protection to be considered in ordering placement for a youth who has been adjudicated a juvenile delinquent, "the rehabilitative goal of the Family Court Act retains its pre-eminence" (*Sebastian v State of New York*, 93 NY2d 790, 795 [1999]). In keeping with this preeminent goal, all facilities operated by the New York State Office of Children and Family Services for alleged and adjudicated juvenile delinquents are required to provide for the "care, custody, treatment, housing, education, rehabilitation and guidance" of such youths (Executive Law § 504 [1]). While education, rehabilitation, and guidance are expressly stated as goals only for adjudicated juvenile delinquents, these goals cannot be disregarded simply because a youth has been placed in detention before a finding of delinquency has been made. To the contrary, it would be inconsistent with the rehabilitative purpose which the juvenile justice system is intended to serve to conclude that the primary purpose of Dylan C.'s remand was to confine him to ensure community safety.

Moreover, the Family Court's findings that remand was necessary because Dylan C. was beyond parental control and that there was a risk that he would engage in additional delinquent activity do not compel us to reach a different conclusion regarding the purpose of his placement. Despite the Family Court's findings, it nevertheless opted against directing that Dylan C. be placed, from the outset, in secure detention. The court's directive that Dylan C. be placed in nonsecure detention, and transferred to a secure setting only if he disobeyed rules, reflects its assessment that the level of potential danger that this youth

posed to the public was not so high as to require his confinement to a locked, jail-like secure detention facility. Rather, the court deemed the environment of a nonsecure facility, which is more structured than a family setting but far less restrictive than secure detention, sufficient to protect the safety of the community. The agency's position that Dylan C. was remanded to nonsecure detention for the purpose of confinement is also undercut by the very nature of the facility in which he was placed. Clearly, nonsecure facilities are intended to provide troubled youths with more structure than they receive at home, and residents are not free to leave at will. Nevertheless, the fact that nonsecure facilities are statutorily prohibited from containing physically restricting construction and hardware which would prevent youths from absconding demonstrates that security, confinement, and the prevention of escapes are not of paramount importance in such facilities. In contrast, although education, rehabilitation, and guidance are also goals in secure facilities, such facilities must make security, confinement, and the prevention of escape a priority for those youths whose conduct has shown that placement in a more restrictive setting is necessary to protect public safety.

We further note that while no appellate court has addressed the issue of whether an alleged or adjudicated juvenile delinquent who absconds from nonsecure detention has committed an act which, if committed by an adult, would constitute a crime, it is well settled that PINS children cannot be subjected to delinquency charges for such conduct (*see Matter of Edwin G.*, 296 AD2d 7 [2002]; *Matter of Naquan J.*, 284 AD2d 1 [2001]; *Matter of Jasmine A.*, 284 AD2d 452 [2001]; *Matter of Caitlin VV.*, 262 AD2d 696, 697 [1999]; *Matter of Sylvia H.*, 78 AD2d 875 [1980]; *People v Dupont*, 179 Misc 2d at 83; *Matter of Freeman*, 103 Misc 2d 649 [1980]). The primary basis for most of these holdings is that it is improper to "bootstrap" a PINS adjudication into one for juvenile delinquency, and thereby circumvent Family Court Act § 720 (2), which prohibits the placement of PINS children in secure detention facilities. As the agency points out, "bootstrapping" is not a concern in delinquency cases, where placement in secure detention is an available option. Nevertheless, accepting the agency's position would lead to the incongruous result that an alleged or adjudicated juvenile delinquent could be subjected to additional charges for running away from the very same type of facility in which PINS children are also placed. While considerations of public safety play a role in the

prehearing detention of alleged juveniles which are not present when considering the detention of alleged PINS children, there is no compelling justification for treating the conduct of these two types of troubled youths in absconding from nonsecure detention with such complete disparity.

Moreover, we do not agree that subjecting an alleged juvenile delinquent to additional charges for absconding from nonsecure detention is necessary to protect the safety of the community. Although PINS children can abscond from nonsecure detention without suffering additional penalty, youngsters who are charged with being or adjudicated juvenile delinquents may not abscond from nonecure detention with impunity. Rather, an alleged or adjudicated juvenile delinquent who runs away faces a great risk of being transferred to a secure, jail-like facility.

Finally, while we are aware that a contrary conclusion was reached in *People v Juarbe* (194 Misc 2d 77 [2002]), upon which the agency relies, we do not find the County Court's analysis in that case to be persuasive. In *Juarbe,* the County Court refused to set aside the conviction of a defendant who had pleaded guilty to escape in the second degree for absconding from a nonsecure facility where he had been placed after being adjudicated a juvenile delinquent. In reaching its conclusion that the defendant engaged in criminal conduct by absconding, the County Court reasoned that *Ortega* was distinguishable because the Legislature had directly addressed the problem of escapes by juvenile delinquents by making explicit reference to them in the statutory definition of detention facility, while no reference had been made to insanity acquittees. The County Court also observed that the analysis in *Ortega,* and in cases involving PINS children who abscond from detention, centered on the purpose for which insanity acquitees and PINS children are detained. The County Court concluded that to further expand the rationale of these cases by considering the purpose for which alleged and adjudicated juveniles are detained would effectively "remove the reference to juvenile delinquents from the definition of 'detention facility' found in Penal Law § 205.00" (*id.* at 84). However, as we have discussed, the Court of Appeals did not rely upon the fact that Penal Law § 205.00 (1) makes no specific reference to psychiatric facilities when it concluded in *Ortega* that nonsecure psychiatric facilities do not come within the scope of the statute. Moreover, we do not share the County Court's concern that holding that juveniles who abscond from nonsecure facilities cannot be subjected to additional delin-

quency charges will effectively remove the reference to juvenile delinquents from the Penal Law definition of detention facility. To the contrary, it will allow such conduct to, in effect, be criminalized only where a juvenile escapes from the type of secure facility contemplated by the Legislature in enacting Penal Law § 205.10, and defining the term "[d]etention facility" in Penal Law § 205.00 (1).

Accordingly, we conclude that the nonsecure facility from which Dylan C. absconded was not a detention facility within the purview of article 205 of the Penal Law, and that the Family Court properly dismissed the petition alleging that Dylan C. had committed an act which, if committed by an adult, would constitute escape in the second degree. Therefore, the order of dismissal is affirmed.

PRUDENTI, P.J., MILLER and BELEN, JJ., concur.

Ordered that the order of dismissal is affirmed, without costs or disbursements.