**STATE of Alaska, Appellant,**

v.

**Kemo T. CROSBY, Appellee.**

No. A–2334.

Court of Appeals of Alaska.

March 24, 1989.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellant.

Lisa M. Fitzpatrick, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

OPINION

BRYNER, Chief Judge.

■ This appeal requires us to determine whether a furloughed prisoner who walks away from a residential drug treatment program may be charged with escape from a correctional facility. We conclude that such a charge is improper.

Kemo T. Crosby was imprisoned after being convicted for various drug-related felonies. The Department of Corrections eventually placed Crosby on furlough to Akeela House, a residential drug treatment program in Anchorage. Crosby walked

away from Akeela House the day after his arrival. He was captured and indicted for escape in the second degree. Crosby was charged with violating subparagraph (a)(1)(A) of AS 11.56.310. Under this subparagraph, second-degree escape occurs when "... one removes oneself from a correctional facility while under official detention." Crosby moved to dismiss the indictment, contending that Akeela House was not a correctional facility. Superior Court Judge Mark C. Rowland granted Crosby's motion and dismissed the case. On appeal, the state challenges the superior court's ruling.

In determining whether Crosby could properly be charged under AS 11.56.-310(a)(1)(A), we must address two separate issues: first, whether Crosby was "under official detention," and, second, whether Akeela House was a "correctional facility." With regard to the first issue, Crosby does not dispute that he was "under official detention" while at Akeela House. Under AS 11.81.900(b)(34), " 'official detention' means custody ... or confinement under an order of a court in a criminal ... proceeding...." Although Crosby was on furlough to Akeela House, he was still serving his sentence and was formally in the custody of the Department of Corrections. Because Crosby was still in state custody while at Akeela House, he must be deemed to have been "under official detention."

The remaining issue is whether Akeela House qualifies as a "correctional facility." "Correctional facility" is defined in AS 11.-81.900(b)(7) as "premises ... used for the confinement of persons under official detention." The state reasons that, because Crosby was in state custody and therefore "under official detention," Akeela House must be deemed to be a place "used for the confinement of persons under official detention." Thus, the state concludes that Akeela House is a "correctional facility."

The state's argument assumes too much. Under the literal terms of AS 11.81.-900(b)(7), the fact that Crosby was "under official detention" does not in itself render Akeela House a "correctional facility." Be-fore it could be deemed a "correctional facility," Akeela House would have been required to keep Crosby under "confinement." While any form of state custody will qualify as "official detention" under AS 11.81.900(b)(34), it is not at all clear that all custody is equivalent to "confinement" for purposes of AS 11.81.900(b)(7). The state simply assumes that "custody" and "confinement" are synonymous.

In response to the state's argument, Crosby maintains that, by requiring actual "confinement" of persons who are in state custody (or "under official detention"), the legislature meant to designate only secure facilities such as prisons to be "correctional facilities." Crosby asserts that Akeela House is not a licensed correctional facility, does not have correctional officers or guards, and does not maintain a level of security commensurate with that of a jail or prison.

It is not entirely clear what the legislature meant by "confinement." The word is not defined in the revised criminal code. Crosby's interpretation does find limited support in the tentative draft commentary to AS 11.56.310, which suggests that escapes from "correctional facilities" were designated as second-degree rather than third-degree escapes because of the heightened danger posed by inmates who seek to remove themselves from secure facilities:

> The Code classifies all escapes from correctional facilities ... as escape in the second degree, a class B felony. Existing law differentiates between an escapee who has committed a felony and one who has committed a misdemeanor; an escape by a misdemeanant is classified as a misdemeanor. The Subcommission concluded that the danger to society resulting from correctional facility escapes is substantial, regardless of whether the escapee is a felon or misdemeanant. The classification of all correctional facility escapes as serious felonies is consistent with the Code provision on the justifiable use of force in preventing an escape from a correctional facility....

4 Alaska Criminal Code Revision 47–48 (Tentative Draft 1977) (citation omitted).

Referral to other codes is also of limited assistance. The derivation tables to the Revised Alaska Criminal Code list Arizona statutes as a source for AS 11.56.310. Like the Alaska Code, the Arizona Penal Code distinguishes among classes of escape based on the circumstances surrounding the escape. *See generally* Arizona Revised Statutes §§ 13–2501—13–2504. Escape from a correctional facility or from custody for a felony is classified as second-degree escape. Arizona Revised Statutes § 13–2503. Escape from custody for a misdemeanor is a third-degree escape. Arizona Revised Statutes § 13–2504.

While we have found no Arizona cases addressing circumstances similar to Crosby's, it is significant that definitions built into the Arizona escape statutes make it clear that "custody" and "confinement" are not synonymous terms. The Arizona Code defines "correctional facility" to mean "a place used for the confinement or control of a person...." Arizona Revised Statute § 13–2501(2). "Custody," on the other hand, is defined to mean "actual or constructive restraint ... but does not include detention in a correctional facility." Arizona Revised Statute § 13–2501(3). Thus, under Arizona law, not only do "custody" and "confinement" have different meanings, but they are in fact mutually exclusive terms.

The Model Penal Code, also listed as a source for AS 11.56.310, is in itself unhelpful, because it does not differentiate between escapes from correctional facilities and escapes from other types of custody. *See* Model Penal Code § 242.6 and accompanying commentary.

The Model Penal Code commentary does, however, refer to New York as typical of states that classify the seriousness of escape by the type of facility involved. New York escape statutes are similar to Alaska's. New York upgrades the class of an escape when it is from a "detention facility." *Compare* N.Y.Penal Law § 205.10(1) *with* § 205.05. "Detention facility" is defined to include "any place used for the confinement ... of a person ... charged with or convicted of an offense...." N.Y. Penal Law § 205.00(1).

Notably, New York courts have held this definition of "detention facility" to apply to secure facilities but not to nonsecure facilities. *Compare People v. Walter,* 115 A.D. 2d 52, 499 N.Y.S.2d 280 (1986) (secure mental health facility qualifies as "detention facility") *with People v. Ortega,* 127 Misc. 2d 717, 487 N.Y.S.2d 939 (Sup.Ct.1985) (nonsecure psychiatric facility is not a "detention facility"). *See also Matter of Freeman,* 103 Misc.2d 649, 426 N.Y.S.2d 948 (Fam.Ct.1980) (nonsecure agency boarding home not a "detention facility").

Additional support for the view that "custody" and "confinement" are not synonymous derives from provisions of Alaska law dealing with prerelease furloughs, which expressly distinguish between release on furlough and "confinement." Thus, AS 33.30.141(a) provides that a prisoner who has violated conditions of release on furlough may be required to return "to actual confinement" for the duration of the prison sentence. Moreover, under AS 33.-30.101(b), before a prerelease furlough is granted to any prisoner, the prisoner must be found capable of living "under reduced supervision." These provisions strongly suggest that our legislature did not regard furloughed prisoners as being under "confinement."

The state nevertheless cites *Parker v. State,* 714 P.2d 802, 805–06 (Alaska App. 1986), and *Beckman v. State,* 689 P.2d 500 (Alaska App.1984), in support of its argument. In *Parker,* we recognized conditions at Akeela House to be essentially custodial and noted that the Alaska Supreme Court has held that defendants placed at Akeela House pursuant to a court order deserve to receive credit for time served. *See Lock v. State,* 609 P.2d 539, 545–46 (Alaska 1980).

In *Beckman v. State,* the defendant violated the conditions of his felony probation. After a probation revocation hearing, the court ordered Beckman released on probation but required him to complete the Akeela House program as a condition of probation. Beckman was in jail at the time; the court ordered him released to Akeela

House as soon as there was an opening in the program. Several days later, an opening occurred. The jail released Beckman to a representative of the Akeela House program. Beckman ran away before arriving at Akeela House and was subsequently charged with escape in the second degree on the theory that he had removed himself "from official detention on a charge of a felony...." Former AS 11.56.310(a)(1)(B). Beckman moved to dismiss, arguing that he was not under "official detention."

At the time of Beckman's case, "official detention" was defined as it is now to include "confinement under an order of the court in a criminal ... proceeding...." AS 11.81.900(b)(34). In considering Beckman's argument and concluding that Beckman had not been under "official detention," we acknowledged that the Alaska Supreme Court, in *Lock v. State*, had characterized participation in Akeela House as the equivalent of custody for purposes of receiving credit for time served. Because Beckman, by participating in Akeela House, was effectively in custody, we reasoned that his participation in Akeela House was "a form of confinement." *Beckman v. State*, 689 P.2d at 502. We nevertheless found that, because Beckman was at Akeela House as a condition of probation, he was not confined "under an order of the court." *Id.*

In the state's view, *Parker* and *Beckman* establish that prisoners furloughed to residential treatment programs such as Akeela House are actually confined. We see no inconsistency between these decisions and the conclusion that furloughed prisoners at Akeela House are not under actual confinement.

The right to receive credit for time served arises when a defendant's liberty is substantially restricted by court order. *See, e.g., Lock*, 609 P.2d at 545–46. In contrast, "confinement," as used in the statutory definition of "correctional facility" that is set out in AS 11.81.900(b)(7), seems to deal not so much with the extent to which freedom is restrained as with the specific manner in which the restraints are imposed and enforced. While the re-straints on a person's liberty at Akeela House may be equivalent to custody and are sufficient to require that credit for time served be given, those restraints are not necessarily imposed or enforced in ways that amount to actual confinement. There is no indication that Akeela House uses armed guards, physical restraints, external security, or other similar measures.

Moreover, the restrictions that Akeela House imposes on its residents are integral to its treatment plan rather than to the Department of Corrections' role in maintaining security over its prisoners. Thus, to the extent that Akeela House relies on restrictive measures amounting to actual confinement, the confinement is clearly not confinement by the state. As we recognized in *Beckman*, "the authority of Akeela House to confine Beckman derived exclusively from Beckman's enrollment in the program, not from any order of the court." *Beckman*, 689 P.2d at 502 (footnote omitted).

In the final analysis, we conclude that the reference to "confinement" in the statutory definition of "correctional facility" is, at best, ambiguous. To the extent that there is ambiguity concerning the meaning of "confinement," that word must be construed narrowly, so as to to resolve the ambiguity in favor of the accused. *Cassell v. State*, 645 P.2d 219, 222 (Alaska App. 1982); 3 C. Sands, Sutherland Statutory Construction, § 59.04 at 26 (4th Ed.1986).

Accordingly, we hold that prisoners released on prerelease furlough to facilities such as Akeela House are not under "confinement" for purposes of AS 11.81.-900(b)(7). Because, under this provision, a "correctional facility" must be a place used for "confinement of persons under official detention," Akeela House does not qualify as a correctional facility. It follows that the superior court did not err in concluding that Crosby could not properly be prosecuted for escape in the second degree under AS 11.56.310(a)(1)(A).

■ The state's remaining claim on appeal is that the superior court erred in refusing to allow amendment of Crosby's indictment to allege a violation of subpara-

graph (a)(1)(B) of AS 11.56.310, which provides that second-degree escape occurs when "one removes oneself from official detention for a felony." Under this provision, when detention is for a felony, it is immaterial whether an escape is from a "correctional facility." Because Crosby was under official detention for a felony, it is clear that he could properly have been charged with second-degree escape under subparagraph (a)(1)(B).

The original indictment, however, did not charge a violation of this subparagraph. It charged Crosby exclusively on the theory that he escaped from a "correctional facility" in violation of subparagraph (a)(1)(A). The state did not make a timely request to amend Crosby's indictment. In fact, when the superior court ruled that Akeela House was not a correctional facility and indicated its intent to grant Crosby's motion to dismiss, the court specifically inquired whether the state wished to amend the indictment to charge possible lesser-included offenses. The state declined to request any amendment. Thereafter, the court ordered dismissal.

It was not until approximately a week after the superior court's dismissal order was entered that the state first moved to amend Crosby's indictment. Even then, the motion was advanced as an alternative to the state's motion for reconsideration, which sought to reargue the original issue decided by the court. The only justification advanced below by the state for its lateness in moving to amend the indictment was a single-sentence unverified assertion that the prosecutor did not initially realize that a charge under subparagraph (a)(1)(B) was a viable alternative. The superior court denied the state's motion for reconsideration summarily, without expressly addressing its alternative motion for amendment.

In arguing on appeal that the superior court abused its discretion in failing to allow amendment of the indictment, the state points out that the amendment would have been proper and would not have resulted in prejudice to Crosby. The state recognizes that it was free to reindict Crosby, but it argues that this would amount to a waste of the state's and the grand jury's time.

Regardless of how appropriate an amendment to the indictment might have been had a timely request been made, the state was certainly not entitled to amendment, as a matter of right, in the absence of a timely motion. At the very least, under these circumstances, it was incumbent on the state to establish good cause for requesting an amendment in an untimely manner. The state's sole explanation for its untimely request, however, was a conclusory and unverified statement essentially admitting that the state had not bothered to become familiar with the statute under which Crosby's offense was charged until after the court had dismissed the case. We would be hard pressed to conclude that the superior court abused its discretion in finding that this explanation did not amount to good cause for the untimely request. Under the circumstances, any inconvenience resulting from the need to re-present Crosby's case to the grand jury must be attributed not to the superior court's lack of discretion but rather to the state's lack of adequate preparation and diligence.

The order of dismissal is AFFIRMED.