**Wendell D. BRIDGE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10176.**

Court of Appeals of Alaska.

Aug. 5, 2011.

cal injury to a person.

Michael Schwaiger, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Anne D. Carpeneti, Assistant Attorney General, Criminal Division Central Office, Juneau (brief), Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage (oral argument), and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

This appeal requires us to clarify the meaning of the term "correctional facility" for purposes of the second-degree escape statute, AS 11.56.310. Under subsection (a)(1)(A) of this statute, a person commits the felony of second-degree escape if they unlawfully remove themselves "from a correctional facility" while they are under official detention for any crime, even a misdemeanor.

The term "correctional facility" is defined in AS 11.81.900(b)(9) as "premises ... used for the confinement of persons under official detention". The question posed in this appeal is whether the word "confinement" is equivalent to "residence" or "placement"—so that the term "correctional facility" would encompass *any* facility or residence where a prisoner has been ordered to remain by the Department of Corrections. Bridge argues that "confinement" has a narrower meaning—that it applies only when a prisoner's mandated residence at a particular facility is physically enforced by guards and restraints.

For the reasons explained in this opinion, we agree with Bridge that, at least for purposes of interpreting the second-degree escape statute, the phrase "premises used for the confinement of persons under official detention" must be given a narrower meaning than "residence" or "placement"—that it applies only to situations where a prisoner's residence is physically enforced.

### Underlying facts

The defendant in this case, Wendell D. Bridge, was charged with a misdemeanor (driving with a suspended license). Because Bridge was unable to make bail, he was remanded to the custody of the Department of Corrections pending his trial.

Bridge was initially confined at the Fairbanks Correctional Center. However, when the Department of Corrections conducted their prisoner classification of Bridge, they concluded that he was eligible for placement at the Northstar Center, a halfway house operated by a private corporation in Fairbanks. The Northstar Center has a contract with the Department of Corrections for housing low-security misdemeanor defendants who are awaiting trial or sentencing. Pursuant to this contract, and pursuant to the Department of Corrections' classification decision, Bridge was placed at the Northstar Center.

Because Bridge was charged with a crime, was unable to make bail, and was in the legal custody of the Department of Corrections, he was under "official detention"—and he remained under official detention even after he was transferred to the Northstar Center.[1]

On New Year's Day 2005, Bridge left the Northstar Center without permission. The Northstar staff notified the police, and the district court later issued a warrant for Bridge's arrest. He was arrested some fifteen months later and charged with second-degree escape.

In the superior court, Bridge argued that the Northstar Center was not a "correctional facility", and thus his act of walking away from the Center did not constitute second-degree escape. To help resolve this controversy, the superior court held a hearing at which the parties presented evidence concerning Bridge's status at the Northstar Center and the types of security measures employed at the Center. Based on the evidence presented at this hearing, the superior court concluded that the Northstar Center would qualify as a "correctional facility" for purposes of the escape statute (assuming the jury viewed the evidence in the light most favorable to the State).

Later, at Bridge's trial, in keeping with this pre-trial ruling, the superior court instructed the jury that "a halfway house under contract with the Department of Corrections ... is a correctional facility for ... individuals placed there by [the Department] for purposes of confinement [awaiting trial or sentencing]." Because it was undisputed that Bridge walked away from the Northstar Center without permission and without justification, the jury convicted Bridge of second-degree escape.

In this appeal, Bridge renews his argument that the Northstar Center did not qualify as a "correctional facility" for purposes of the escape statute. If Bridge is correct, then his act of leaving the Northstar Center without permission did not constitute second-degree escape; instead, his action constituted the lesser offense of fourth-degree escape under AS 11.56.330(a)(1). (This statute prohibits *any* act of "remov[ing] oneself from official detention for a misdemeanor".)

*This Court's decision in State v. Crosby*

This Court's decision in *State v. Crosby*, 770 P.2d 1154 (Alaska App.1989), is the primary appellate court decision construing the term "correctional facility" for purposes of Alaska's second-degree escape statute. Both Bridge and the State discuss *Crosby* at length in their briefs. Accordingly, to meaningfully address the arguments in the parties' briefs, we must examine the *Crosby* decision in some detail.

The defendant in *Crosby* was a sentenced prisoner who was released from prison on furlough to a residential drug treatment program, Akeela House.[2] Shortly after Crosby arrived at this residential facility, he walked away.[3] The State charged Crosby with second-degree escape, alleging (in the words of the statute) that he removed himself "from a correctional facility while under official detention." [4] The superior court ruled that Akeela House was *not* a "correctional facility"

---

1. The term "official detention" is defined as "custody, arrest, surrender in lieu of arrest, or actual or constructive restraint under an order of a court in a criminal or juvenile proceeding, other than an order of conditional bail release". AS 11.81.900(b)(40).

2. *Crosby,* 770 P.2d at 1154.

3. *Id.* at 1155.

4. *Ibid.*

for purposes of the escape statute, and the State then appealed.[5]

The term "correctional facility" is defined in AS 11.81.900(b); it means "[any] premises ... used for the confinement of persons under official detention".[6] In *Crosby*, the State took the position that, under this definition, the term "correctional facility" applied to *any* facility utilized by the Department of Corrections to house prisoners.[7] But this Court rejected the State's reading of the statutory definition.

This Court's explanation of why we rejected the State's interpretation of the statute is lengthy and somewhat difficult to follow, but the salient point of our analysis was that the statutory definition of "correctional facility" does not encompass any and all premises used for the *placement* or *custody* of persons under official detention. Rather, the statute defines "correctional facility" as premises used for the *confinement* of persons under official detention. *Crosby*, 770 P.2d at 1155.

Because our criminal code contained no definition of "confinement", we engaged in a lengthy analysis of the potential meanings of this word in the context of an escape statute. We concluded that the concept of "confinement" seemed to focus "not so much [on] the extent to which [a person's] freedom is restrained[, but rather on] *the specific manner* in which the restraints are imposed and enforced". *Id.* at 1157 (emphasis added).

We then offered two different explanations of why Crosby's placement at the Akeela House residential treatment center did not constitute "confinement"—and, thus, why Akeela House was not a "correctional facility" for purposes of the second-degree escape statute. Our decision to offer two different explanations appears to stem from the fact that the trial court record did not offer a clear answer as to whether Akeela House employed security guards or utilized physical restraints or barriers to keep residents from leaving the premises without permission.

This Court's first explanation of why Crosby was not in "confinement" at Akeela House was that, even though the conditions of Crosby's furlough from prison required him to remain at Akeela House, this restraint on his liberty was not "imposed or enforced in ways that amount to actual confinement". *Ibid.* We noted that "there [was] no indication" Akeela House had armed guards, physical restraints or barriers, or other security measures to physically prevent Crosby from leaving. *Ibid.*

This Court's second explanation of why Crosby was not in "confinement" at Akeela House appears to be based on the alternate possibility that Akeela House did, in fact, use guards or physical restraints to prevent residents from leaving without permission. We declared that "[any such] restrictions that Akeela House [placed] on its residents" were imposed for the purpose of furthering its treatment plan, and not because Akeela House was the agent of the Department of Corrections for the purpose of "maintaining security over its prisoners". *Ibid.* "Thus," we concluded, "to the extent that Akeela House relies on restrictive measures amounting to actual confinement, [this] confinement is clearly not confinement by the state." *Ibid.*

This second rationale appears to be squarely predicated on the fact that Crosby was a *furloughed* prisoner—*i.e.*, someone who had been granted "an authorized leave of absence from actual confinement for a designated purpose and period of time". AS 33.30.901(9) (the definition of "furlough"). In other words, the Department of Corrections had affirmatively decided to relinquish physical custody of Crosby for the purpose of allowing him to participate in the residential drug treatment program at Akeela House. Under the terms of Crosby's furlough, he was obligated to participate in this residential treatment program—but the Department apparently trusted Crosby to do just that, and the Department took no steps (either directly, or through agreement with Akeela

---

**5.** *Ibid.*

**6.** At the time of the litigation in *Crosby,* this definition was found in AS 11.81.900(b)(7). Since then, the statute has been renumbered as

section 900(b)(9), but the definition remains the same.

**7.** *Crosby,* 770 P.2d at 1155.

House) to physically confine Crosby to the treatment facility. Rather, in the words of AS 33.30.091(9), Crosby was on a "leave of absence from actual confinement".

In sum, our decision in *Crosby* appears to have been ultimately based on the fact that the defendant was on furlough at the time he engaged in his unauthorized departure from Akeela House. But in our discussion of this issue, we suggested that even when a person is under official detention and living at a residential facility, the person is not "confined" there, for purposes of the escape statute, unless (1) the person is required to reside at the facility, (2) the person's required residency is enforced by guards or by physical restraints on the person's ability to leave, and (3) the guards or physical restraints are used at the behest of, or under the agency of, the Department of Corrections for the purpose of maintaining security over its prisoners, rather than for the private purposes of the corporation or group that runs the facility.

We note that the Alaska Legislature has not enacted a statutory definition of "confinement", nor has the legislature altered the statutory definition of "correctional facility", since we decided *Crosby* in 1989.

*Bridge's argument on appeal*

In his brief to this Court, Bridge focuses on the portion of *Crosby* where we suggested that "confinement" hinges "not so much [on] the extent to which [a person's] freedom is restrained[, but rather on] the specific manner in which the restraints are imposed and enforced".[8]

Bridge devotes the majority of his brief to a discussion of the lack of security measures at the Northstar Center. According to the testimony presented at the evidentiary hearing in this case, the Northstar Center is a "non-secure" facility, in that it does not have guards, or a security fence, or even surveillance cameras. Inmates wear their own clothes, they have their own money, and they are not locked inside the facility. The members of the Northstar staff do not carry weapons, and they are instructed not to try to physically restrain inmates who leave the premises.

Relying on the absence of guards and physical restraints at the Northstar Center, Bridge argues that the Northstar Center is not a "correctional facility" because he was not subjected to "confinement" in the sense of physical restraints on his freedom. The problem with Bridge's argument is that it hinges on a portion of *Crosby* that appears to be dictum.

As we explained above, the *Crosby* decision offered two different explanations of why Crosby's residence at Akeela House did not constitute "confinement". The first explanation—*i.e.,* the portion of *Crosby* that Bridge relies on—dealt with the fact that Akeela House *apparently* did not utilize guards or physical restraints to keep residents from leaving without permission. But the record was unclear on this point, so this Court offered a second, alternative explanation for why Crosby's residence at Akeela House did not constitute "confinement". And under this second explanation, it was *irrelevant* whether Akeela House used guards or physical restraints to maintain control of its residents. This Court stated that even if Akeela House *did* utilize guards or physical restraints to keep residents from leaving, this would not constitute "confinement" for purposes of the escape statute—because these guards and physical restraints were not employed at the behest of the Department of Corrections, but rather were employed for the private purposes of Akeela House.[9]

Under this second rationale, the question of whether (or to what degree) the defendant in *Crosby* was subjected to physical restraints on his liberty during his residence at Akeela House was moot. The answer to this question made no difference to this Court's decision. Thus, our discussion of what type of restraint might constitute "confinement" for purposes of the escape statute became dictum.

**8.** *Id.* at 1157.

**9.** *Ibid.*

*The question of "confinement" revisited*

Bridge was not on furlough at the North-star Center. That is, unlike the defendant in *Crosby*, no one had authorized Bridge to embark on a "leave of absence from actual confinement". Rather, Bridge was a misdemeanor defendant who was awaiting trial, and who had been remanded to the custody of the Department of Corrections because he was unable to make bail. Because of this, Bridge's case requires us to re-examine the question of what constitutes "confinement" for purposes of the escape statute.

The State's main argument in this appeal is that Bridge should be deemed to have escaped from "confinement" because the Department of Corrections placed Bridge at the Northstar Center in lieu of housing him at the Fairbanks Correctional Center. The State points out that Bridge knew that he was legally obligated to remain at the North-star Center: Bridge was a prisoner who was being held in custody awaiting his trial, and he remained a prisoner even though he had been granted the benefit of waiting for his trial at a non-prison facility.

The State's description of Bridge's status is correct, but the State's argument is essentially the same one we rejected in *Crosby*. In *Crosby*, the State argued that the term "correctional facility" applied to *any* facility utilized by the Department of Corrections to house prisoners.[10] But as this Court noted in *Crosby*, the statutory definition of "correctional facility" does not encompass any and all premises used for the *placement* or *custody* of persons under official detention. Rather, the statute defines "correctional facility" as premises used for the *confinement* of persons under official detention. *Crosby*, 770 P.2d at 1155. Thus, we must decide whether the legislature intended the word "confinement" to mean something more specific or limited than "placement" or "custody".

One basic difficulty in answering this question is the fact that the word "confinement",

like the word "convicted", can mean different things, depending on the context.[11]

For example, AS 33.30.065 authorizes the Department of Corrections to allow a prisoner to serve their term of imprisonment, or to serve their period of temporary commitment while awaiting trial, by living at home under electronic monitoring. One might speak of these prisoners as being "confined" to their residence, even though no one is guarding them, and even though they are permitted to leave their home for various authorized purposes.

But as we noted in *Crosby*, the commentary to the draft provisions of our current escape statutes suggests that the word "confinement" was being used in a more restrictive sense—the sense of actual physical restraints placed on a person's movement, enforced by officers whose duty is to keep the person from leaving without permission:

[T]he tentative draft commentary to AS 11.56.310 ... suggests that escapes from "correctional facilities" were designated as [a higher degree of crime] because of the heightened danger posed by inmates who seek to remove themselves from secure facilities:

> The Code classifies all escapes from correctional facilities ... as escape in the second degree, a class B felony. Existing law differentiates between an escapee who has committed a felony and one who has committed a misdemeanor; an escape by a misdemeanant is classified as a misdemeanor. The [Criminal Code Revision] Subcommission concluded that the danger to society resulting from correctional facility escapes is substantial, regardless of whether the escapee is a felon or misdemeanant. The classification of all correctional facility escapes as serious felonies is consistent with the Code provision on the justifiable use of force in preventing an escape from a correctional facility[.]

**10.** *Crosby*, 770 P.2d at 1155.

**11.** *See State v. Otness*, 986 P.2d 890, 893 (Alaska App.1999): "This court has recognized that the term 'convicted' can have different meanings, depending on the context. For some purposes, defendants are deemed 'convicted' when a jury

or a judge finds them guilty. For other purposes, defendants are not 'convicted' until the court formally enters judgement against them following the sentencing hearing." (Footnotes omitted)

*Crosby,* 770 P.2d at 1155, quoting Alaska Criminal Code Revision, Tentative Draft, Vol. 4 (1977), pp. 47–48.

This passage from the commentary to the Tentative Draft suggests that the drafters intended to draw a distinction between (1) all prisoners who unlawfully depart from the premises where they have been placed by the Department of Corrections, and (2) those prisoners who unlawfully depart from a facility where there are restraints or limitations on the prisoners' movement, and where corrections officers or other facility staff, acting as agents of the Department, are charged with the duty of preventing the prisoners from departing without permission. It is in these latter circumstances that an escape or attempted escape from the facility poses a heightened danger.

This was the context in which the *Crosby* court remarked that the word "confinement", as used in the statutory definition of "correctional facility", and as interpreted in the context of the second-degree escape statute, "seems to deal not so much with the extent to which [a person's] freedom is restrained as with the specific manner in which the restraints are imposed and enforced." *Crosby,* 770 P.2d at 1157.

In other words, there would be no "confinement" if a prisoner is subject only to *legal* restraints on their physical liberty, in the form of a Department of Corrections order directing them to reside at a particular facility. Rather, "confinement" would exist only when the prisoner's residence at the facility is forcibly maintained.

We note that the legislature appears to have used the word "confined" in this same narrow sense in AS 33.30.181(a), a statute that deals with prisoners whom the Department of Corrections has placed in a community restitution center. This statute declares that a prisoner who has been placed in one of these centers "shall be confined to the center at all times" *except* when the person is at work, or is traveling to and from work (or to attend a job interview), or is absent for another purpose specially approved by the commissioner. In this statute, the phrase "con-fined to the [community restitution] center" clearly means something more narrow than "placed in a community restitution center" or "classified to a community restitution center".

As we noted earlier in this opinion, this is not the only sense in which people use the words "confine" or "confinement". These words can mean different things in different contexts.

For example, when our supreme court declared in *Rust v. State* that the Commissioner of Corrections has the sole discretion to designate "the prison facility to which the prisoner is to be confined",[12] it is clear that the supreme court was using the word "confined" in the broader sense of "placed".

Similarly, it may make good sense to give the word "confinement" a broader meaning for purposes of interpreting AS 33.30.193, the statute that guarantees prisoners meaningful access to the courts for the purpose of challenging "the conditions of the prisoner's confinement". And it would seem that a broader interpretation of "confinement" might be justified when interpreting AS 33.30.211(b), the statute which provides that copies of a prisoner's pre-sentence report "and any other information ... that may affect the person's rehabilitation" shall be transmitted to the superintendent of the correctional facility in which the prisoner is "confined". For the same reasons, a broader interpretation of "confinement" might be warranted when interpreting AS 33.36.010, the statute which declares that it is the policy of the State of Alaska "not to transfer a resident inmate [to a facility] outside of [this] state" under the Interstate Corrections Compact "if [the] inmate's continued confinement in Alaska will better facilitate [their] rehabilitation or treatment".

In Judge Bolger's dissenting opinion, he asserts that the definition of "confinement" that we adopt in the present case will have manifold unfortunate consequences—because that same definition will apply in all of the contexts we have just mentioned, as well as several other contexts that Judge Bolger lists in his dissent. We disagree.

**12.** 582 P.2d 134, 137 (Alaska 1978).

no

■ The limited question before us is the proper interpretation of "confinement" for purposes of interpreting the scope of the second-degree escape statute. Our definition of "confinement" for this particular purpose does not necessarily govern the meaning of this term for other purposes—because it is possible for the same word or phrase to have different meanings in different contexts. For example, this Court has repeatedly recognized that the word "conviction" can mean different things, depending on the context of the statute or rule being construed. *See Larson v. State,* 688 P.2d 592, 597–98 (Alaska App.1984); *Kelly v. State,* 663 P.2d 967, 971–72 (Alaska App.1983).

In the present appeal, our task is to identify the conduct that constitutes an escape from confinement for purposes of the second-degree escape statute. This statute declares that any escape from a "correctional facility" is a class B felony, even when the defendant's underlying criminal conduct (or charged conduct) is only a misdemeanor.

As we explained in *Crosby,* and as we explained earlier in this opinion, the commentary to the Tentative Draft of our criminal code suggests that the legislature's underlying justification for this decision was the perception that escapes from correctional facilities pose a significantly greater degree of danger than other escapes, even when the defendant's underlying crime or criminal charge is not itself particularly serious.

But this rationale—the greater potential danger posed by an escape from "confinement"—does not appear to apply to situations like the one presented in Bridge's case: situations where a prisoner simply walks away from a residence where they have been directed to stay. Rather, the legislature's rationale appears to apply only when the restrictions on a prisoner's physical liberty are enforced by officers whose duty is to keep the person from leaving without permission.

We agree with the State that a prisoner can be "confined" in a facility, for purposes of the second-degree escape statute, even though that facility does not have "gun tower[s] or a fence topped with barbed wire to keep [prisoners] in place". The paramount distinction between "placement" at a facility and "confinement" at a facility is the presence of corrections officers or other people whose duty is to prevent unauthorized departures from the facility—because the increased danger posed by escapes or attempted escapes from such facilities stems from the conflict or risk of conflict between prisoner and these officers.

Thus, for instance, a work farm that has no towers and no restraining wall or fence could still be a place of "confinement" if it was staffed by corrections officers whose duty was to prevent prisoners from leaving without permission. But on the other hand, the fact that a halfway house has a wall or fence running around the perimeter of its lawn would not, of itself, convert the halfway house to a place of "confinement" if, as in Bridge's case, no officer or staff member had the duty to stop residents from leaving the halfway house without permission.

For these reasons, we agree with Bridge that the superior court was wrong to instruct Bridge's jury that the Northstar Center was a "correctional facility" simply because it housed defendants who were placed there by the Department of Corrections pending their trial or sentencing. The Northstar Center's status as a "correctional facility" hinged on an additional question of fact: whether prisoners' residence at the Center was forcibly maintained by corrections officers or by other guards or staff members acting as agents of the Department of Corrections (either formally or *de facto* ).

### The procedural posture of Bridge's case

During the pre-trial proceedings in Bridge's case, the superior court ruled that it was irrelevant what types of restraints or controls were placed on prisoners at the Northstar Center. Instead, the superior court ruled that *any* halfway house was a "correctional facility" if, under contract with the Department of Corrections, it housed defendants who were in custody awaiting trial or sentencing.

At Bridge's trial, the jurors were instructed in accordance with the superior court's ruling. That is, the jurors were told: "A

halfway house under contract with [the] Department of Corrections ... is a correctional facility for pre-sentenced individuals placed there by [the Department] for purposes of confinement." In addition, the trial judge barred the defense attorney from arguing that the Northstar Center did not qualify as a "correctional facility" because the Center did not impose physical restraints on the freedom of its residents.

As we have explained, this jury instruction and this ruling were wrong. If the staff of the Northstar Center had no duty to physically prevent inmates from leaving without permission, then the Northstar Center was not a "correctional facility"-not a facility where prisoners were "confined".

For this reason, Bridge is entitled to a new trial on the charge of second-degree escape.

■ In a single sentence at the end of his opening brief, Bridge asserts that the double jeopardy clause bars the State from retrying him on this charge. This is incorrect. The flaw in Bridge's trial is that the jurors were misinstructed, in the government's favor, on an element of the offense. The constitution does not bar a retrial under these circumstances.[13]

If the State believes that it will be unable to establish that the Northstar Center qualifies as a "correctional facility" under the test we have announced here, then the State may ask the superior court to enter judgement against Bridge on the lesser offense of fourth-degree escape under AS 11.56.330(a)(1)—the statute which prohibits any act of "remov[ing] oneself from official detention for a misdemeanor".

The judgement of the superior court is REVERSED.

BOLGER, Judge, dissenting.

We recently held that a prisoner at a halfway house was "confined" in a "correctional facility" for purposes of the good-time credit statute.[1] I believe that the escape statute should be construed the same way. The requirement of armed guards is not mentioned in the text or history of this statute or in the numerous other criminal procedure statutes where these terms are used.

The central issue in this case is whether Northstar Center is a "correctional facility"—that is, a "premises ... used for the confinement of persons under official detention."[2] We considered the meaning of the term "confinement" when we addressed another section of the escape statute in *Beckman v. State*.[3] We concluded that Beckman was subject to "confinement" when he was allowed to attend residential treatment at Akeela House.[4] But Beckman was not confined "under an order of a court," as required by the definition of "official detention," because he was released to attend Akeela House as a condition of his probation.[5]

The legislature amended the definition of "official detention" in 1991.[6] The amendment was intended to overrule two of our cases that had construed this term narrowly.[7] I believe that the amendment corrected an ambiguity in the term "confinement" as it had been previously construed. The definition of "official detention" now includes "actual or constructive restraint" imposed by a court order.[8] When this definition is inserted into the definition of "correctional facility," that term now includes a facility designated for "confinement" under the constructive restraint of a court order. In other words, the statute now includes facilities where the prisoners are constructively re-

13. *See West v. State*, 223 P.3d 634, 639–640 (Alaska App.2010); *Burks v. United States*, 437 U.S. 1, 15–16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *State v. Kalaola*, 124 Hawai'i 43, 237 P.3d 1109, 1141 (2010); *State v. Rosaire*, 123 N.M. 250, 939 P.2d 597, 601–02 (App.1996).

1. *State v. Shetters*, 246 P.3d 332, 333 (Alaska App.), *aff'd on reh'g*, 246 P.3d 338 (Alaska App. 2010).

2. AS 11.81.900(b)(9).

3. 689 P.2d 500 (Alaska App.1984).

4. *Id.* at 502.

5. *Id.*

6. *See* Ch. 91, § 3, SLA 1991.

7. *See id.* at § 1.

8. AS 11.81.900(b)(40).

strained as well as facilities with barbed wire and armed guards.

The terms "confinement" and "correctional facility" are used in many criminal statutes. The definition of "correctional facility" that we construe in this case will also determine the scope of correctional facility litigation,[9] liability for sexual assault,[10] liability for promoting contraband,[11] the responsibility for victim notification in domestic violence cases,[12] the liability for correctional facility surcharges,[13] and the deadline for sex offender registration.[14] None of these applications suggest that this term should be limited to facilities with armed guards.

These terms are also used to define the requirements for criminal punishment. Various statutes require that a person sentenced to imprisonment must report to serve a term of "confinement" at a "correctional facility,"[15] that he will accrue good-time credit if he follows the rules of the "correctional facility" where he is "confined,"[16] that he will be returned to "confinement" in a "correctional facility" if he violates parole,[17] and that he will begin probation upon his release from "confinement in a correctional facility."[18]

My point is that these terms are used throughout the criminal statutes, and they should be construed consistently.[19] I would read the terms that apply to the escape statute in the same way that we have applied those terms to the good-time credit statute. In other words, I agree with the trial judge's instruction in this case—a halfway house is a "correctional facility" for those pretrial detainees who are placed there by the Department of Corrections.

---

9. *See* AS 09.19.200(g)(3).

10. *See* AS 11.41.425(a)(2).

11. *See* AS 11.56.375, .380.

12. *See* AS 12.30.027(d).

13. *See* AS 12.55.041(a).

14. *See* AS 12.63.010(a)(1).

15. *See* AS 12.55.025(c).

16. *See* AS 33.20.010(a).

17. *See* AS 33.16.250(a).

18. *See* AS 12.55.125(*o* ).

19. *See State v. Strane*, 61 P.3d 1284, 1286 n. 4 (Alaska 2003) (stating that statutes relating to the same subject matter should be construed together as a scheme that maintains the integrity of each statute).